UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 3:16-CR-254 |
| | : | |
| v. | : | (JUDGE CAPUTO) |
| | : | |
| DAVID D. KLEPADLO, and | : | |
| DAVID D. KLEPADLO & | : | FILED ELECTRONICALLY |
| ASSOCIATES, INC. | : | |
| Defendants | : | |

## SENTENCING MEMORANDUM OF THE UNITED STATES

COMES NOW, the United States of America, by and through its attorneys, and respectfully files a Memorandum to aid the Court in arriving at a fair and just sentence in this case. Sentencing is scheduled for September 30, 2019 at 10:00 a.m.

## I.    Legal Overview

The Clean Water Act (CWA) prohibits the discharge of any pollutant from a point source into navigable waters of the United States without a permit. 33 U.S.C. § 1311(a). The Environmental Protection Agency's (EPA) National Pollutant Discharge Elimination System (NPDES) is a program under the Clean Water Act (33 U.S.C. Section 1319) and is authorized by both federal and state laws (Pennsylvania Clean Streams Law & PA Code Title 25) and associated rules and

1

regulations under which the Commonwealth is authorized to take primary responsibility for issuing CWA permits. The program is meant to preserve and protect the waterways of the nation by setting limits and standards for the proper operation of wastewater treatment systems, including required compliance sampling and truthful reporting. EPA's NPDES permit program controls discharges of pollutants, as pollutants degrade surface waters making them unsafe for drinking, fishing, swimming, and other activities.

Industrial, municipal, and other facilities must obtain permits if their discharges go directly to surface waters from a point source. The PA Department of Environmental Protection (PADEP) is the state agency responsible for administering the NPDES program in Pennsylvania.

All treatment facilities that discharge wastewater must have an NPDES permit. The <u>NPDES permit is specific to each treatment facility</u> and regulates pollutants and describes the terms and conditions that a permit holder must meet in order to discharge properly treated wastewater. The program requires permit holders to participate in a <u>self-monitoring program</u> where they must collect samples and conduct

analysis on the effluent produced by the permitted facility.  In the case

of Greenfield Township and Benton-Nicholson, there are both daily and

weekly monitoring requirements. The <u>heart of the program is self-</u>

<u>monitoring</u>.  Any failure in regard to self-monitoring (such as

fraudulent, inaccurate or misleading results) destroys public confidence

in this type of program to effectively protect our waterways.[1]

The NPDES Permit requires the permittee to submit Discharge

Monitoring Reports (DMRs) on a monthly basis to PADEP.  Each DMR

contains a statement warning of severe consequences for false

reporting.   PADEP uses accurate DMR data to determine the proper

operation of wastewater treatment facilities.  Honest self-monitoring

---

[1]    The foremost purpose of the CWA is "to restore and maintain
the chemical, physical, and biological integrity of the Nation's waters."
33 U.S.C. § 1251. To that end, the CWA prohibits all discharge of
pollutants into navigable waters except inasmuch as one of several
enumerated statutory exceptions applies. *See* 33 U.S.C. § 1311(a). One
such exception is where the polluter has been issued a National
Pollution Discharge Elimination System ("NPDES") permit. *See* 33
U.S.C. § 1342. The effluent discharge standards or limitations specified
in an NPDES permit define the scope of the authorized exception to the
prohibition in § 1311(a), and authority to administer the NPDES permit
system may be delegated to a state or regional agency where the state
or regional regulatory scheme meets certain criteria. *See* 33 U.S.C. §
1342(b); *see also Citizens for a Better Environment–California v. Union
Oil Company of California,* 83 F.3d 1111, 1113–14 (9th Cir.1996).

remains the core of the DMR requirement, as every environmental consultant knows.

II.   <u>Factual Background</u>

In approximately December of 2013, the EPA Criminal Investigation Division initiated an investigation involving David D. Klepadlo and Associates, Inc. (DKA), and David D. Klepadlo (Klepadlo) and possible violations of the CWA based on a referral from PADEP.[2] Klepadlo is the owner, operator and president of DKA, which is a multi-disciplined civil and environmental engineering firm with a business address located in Clark Summit, Pennsylvania.  At the time of the investigation, Klepadlo was certified by the Commonwealth of Pennsylvania as a wastewater treatment system operator.

---

[2]   The initial criminal investigation also involved potential fraud committed by Klepadlo.  The Government notes this because to the extent that victims are identified, it is the Government's position that the residents of the local municipalities are victims of Klepadlo's criminal conduct.  The municipal entities that hired Klepadlo and his company were defrauded.  The terms of the contract to operate the plants in question reveal that Klepadlo and Greenfield Township had an "unsigned contract" since 1989 to operate the plant.  Based upon a review of invoices, Klepadlo received $3,300 per month to operate the Greenfield plant and comply with the NPDES Permits.  For Benton-Nicholson, based on a review of the invoices, Klepadlo received $2,200 per month to operate the Benton-Nicholson plant and comply with the NPDES Permits.

The conduct under investigation occurred at both the Greenfield Township (Greenfield) and Benton-Nicholson (Benton-Nicholson) facilities and is similar; that is, Klepadlo failed to properly operate and maintain the plants as required by the Permit, regularly failed to conduct required compliance monitoring and sampling in accordance with Permits due to staffing or substitution of his own judgement as to whether such sampling was necessary, and then submitted false sampling results on monthly DMR reports to the PADEP to conceal his lack of attention of the plants and despite knowing the importance of accurate monitoring. This practice of failing to test and then submitting false DMRs occurred over a period of years. This practice continued despite repeated warnings personally addressed to Klepadlo by PADEP inspectors over a period of years. Klepadlo has admitted to agents and his employee that he did not see it necessary to comply with the NPDES Permits.

In or about April 2013 and in the face of utter defiance by Klepadlo, concerns of PADEP field inspectors reached an intolerable level regarding plants operated by Klepadlo. For example, on random visits to one or more of the facilities, inspectors rarely noticed the

operator of the facility at the location.  During the winter months, inspectors would drive to one of the facilities and fail to see tracks in the snow.  PADEP inspectors regularly observed biologically dangerous growths around discharge pipes that caused concerns, and routinely received complaints about foul odors emanating from one of the facilities.  Inspectors routinely noted heavy growth of sphaerotilus natans,[3] and a build-up of solids and wastewater debris, such as condoms and personal hygiene applicators on the bottom of the stream and on the banks.

PADEP inspectors interviewed Klepadlo on April 24, 2013 during an inspection at Greenfield.   Klepadlo told them that required daily sampling of pollutants at both Greenfield and Benton-Nicholson was not being done and test results were only "estimated" results.  In violation of the PADEP permits, the "estimated" results were the

---

[3]   Sphaerotilus natans is an aquatic bacteria associated with polluted water.  It forms colonies commonly known as a sewage fungus and can cause bulking of sludge in the wastewater treatment plant's clarifier tank.  It is controlled by proper chlorination, part of the proper operation and maintenance of a sewage treatment plant.  If inadequate chlorination occurs in treatment, sphaerotilus natans bacterial filaments may be noted in the receiving stream, along with the untreated or partially treated sewage.

results reported on required monthly DMRs submitted to the PADEP by Klepadlo for both Greenfield and Benton-Nicholson. Inspectors learned that this was an ongoing, continuous, and repetitive course of conduct, in terms of how Klepadlo operated the facilities he managed.

Klepadlo acknowledged during the inspection that the Greenfield Permit required daily monitoring for pollutants, including pH and dissolved oxygen, but stated that, in his opinion, such testing was not necessary - no matter what the Permit required. Klepadlo said that testing was only done a few times a week, and even that was factually untrue based on video surveillance conducted in 2014. He stated that on days when no one visited the facilities, the sampling results were "*estimated*" because "*there is no reason to test daily*" since the results did not change much on a daily basis. Klepadlo stated that he did not care what the Permit required and admitted that he had routinely been submitting false results to PADEP on DMRs. Klepadlo stated that this was a practice he had been following for 20 plus years, no matter what permits required.[4]

---

[4]    At a later time in a recorded conversation, Klepadlo stated that his credentials were far superior to those of the PADEP inspectors and that he knew better.

The above conversation occurred in April of 2013. At that time, Klepadlo was again advised and warned by PADEP inspectors, <u>as he had been on multiple previous occasions</u>, about how important it was to comply with the Permit and that ignoring the required testing could result in serious harm. As is evidenced below, Klepadlo defiantly and intentionally ignored the environmental parameters and Permit requirements and continued to submit false test results on DMRs monthly to the PADEP.

PADEP did not issue any Notices of Violations (NOVs) for the violations noted and observed on April 24, 2013. Similar prior issuances of violations had not resulted in Permit compliance. Instead, a referral was made to the United States EPA Region III Criminal Investigations Division.

Based upon the above concerns and others, investigators installed surveillance cameras at the Greenfield Township and Benton-Nicholson plants. Pole cameras were installed at both plants for a period of six months from December 2013 through June 2014. The video surveillance at both Greenfield and Benton-Nicholson revealed that on <u>most</u> days between December 2013 and June 2014, no one showed up at

either Greenfield or Benton-Nicholson to perform required <u>daily</u> testing of pollutants, take required <u>weekly</u> composite testing at either facility, or perform required operation and maintenance. The plants were left to fend for themselves, and the township authorities that had hired Klepadlo were being cheated out of their money.

### *Video Surveillance of Greenfield Wastewater Treatment Plant*

The Greenfield NPDES Permit required that grab samples for pH (using a pH meter in-situ or within 15 minutes of collection) and Dissolved Oxygen (DO) (using a DO meter in-situ or within 15 minutes of collection) be collected <u>daily</u> and analyzed immediately. Grab samples for fecal coliform were required weekly and were required to be analyzed within six hours of collection (grab sample is collected separately from the composite sample and sent to a laboratory for analysis).[5]

The Greenfield NPDES Permit also required taking composite samples, that is, collecting samples, either manually or with a composite sampler, mixing them together over a period of time (such as

---

[5] The "flow" (MGD) required continuous measurement with proper recording instrumentation.

8 hours or 24 hours) that are proportional to the flow.  Additionally, 8-hour composite samples had to be collected at least once a week to represent how the treatment plant was functioning over a period in time.  Under the Greenfield NPDES Permit, composite samples for COBD5, Total Suspended Solids (TSS), and Ammonia-Nitrogen (NH3-N) were required to be collected at least once a week.  Similar composite samples for Ammonia-N, Kjeldahl-N, Nitrate-Nitrite as N and Total Phosphorus were required to be collected at least two times a month.

During 116 days of unobscured video surveillance between December 18, 2013 and June 17, 2014 (giving Klepadlo the benefit of the doubt regarding anything obscured), Klepadlo and/or his employee visited the plant on only 17 occasions and were observed collecting daily grab samples on only 8 of those17 days.  The eight days were January 7, 2014, February 7, 2014, March 28, 2014, April 11, 2014, April 18, 2014, May 13, 2014, May 15, 2014, and May 21, 2014.  On the DMRs submitted by Klepadlo for the period of surveillance, Klepadlo reported that samples were collected every day for the pollutant parameters required by the Permit.  Assuming that the eight grab samples were tested (although no meter instruments or sample measurements taken

were noted on video), there were no samples collected on 108 days, and the results for pH and DO were falsified on DMRs.

During the April 23, 2013 inspection, Klepadlo told PADEP inspectors that his practice was to collect the composite samples on Fridays. During the video surveillance, there were no composite samples (either for the one per month or two per month sample requirements) taken on the 17 Fridays of December 18, 2013, December 27, 2013, January 8, 2014, January 15, 2014, January 23, 2014, February 14, 2014, February 21, 2014, March 28, 2014, April 4, 2014, April 11, 2014, April 25, 2014, May 9, 2014, May 16, 2014, May 23, 2014, May 30, 2014, June 6, 2014, and June 12, 2014.

However, on the DMRs submitted by Klepadlo and signed by Klepadlo for the period of surveillance, he reported that composite samples were collected on Fridays for the pollutant parameters requiring composite sample monitoring. During the video surveillance months, the falsified Greenfield DMRs did not show exceedances, except for two exceedances noted on the June 2014 DMR for Nitrogen-Ammonia (Total as N) 4.26 lbs/day (permit limit for 30-day average of 2.9 lbs/day) and 7.60 mg/l (permit limit for 30-day average of 2.5 mg/l).

Since the video surveillance ended on June 17, 2014, the entire month of June was not captured on video. Of course, Klepadlo had no way of knowing whether the plant was discharging in compliance with the CWA because he was not showing up to take samples as required by the law and his contracts.

## *Video Surveillance of Benton-Nicholson Wastewater Treatment Plant*

Klepadlo also operated the Benton-Nicholson wastewater treatment plant. The Benton-Nicholson NPDES Permit required that a grab sample for pH be collected daily and analyzed immediately (using a pH meter in-situ or within 15 minutes of collection). Grab samples for Dissolved Oxygen (DO) (using a DO meter in-situ or within 15 minutes of collection) and a grab sample for fecal coliform were required weekly and were required to be analyzed within six hours of collection (grab sample is collected separately from the composite sample and sent to a laboratory for analysis).[6]

The Benton-Nicholson NPDES Permit also required taking composite samples, that is, collecting samples, either manually or with

_____

[6] The "flow" (MGD) required continuous measurement with proper recording instrumentation.

a composite sampler, mixing them together over a period of time (such as 8 hours or 24 hours) that are proportional to the flow. Additionally, 8-hour composite samples had to be collected at least once a week to represent how the treatment plant was functioning over a period in time. Under the Benton-Nicholson NPDES Permit, composite samples for COBD5, Total Suspended Solids (TSS), and Ammonia-Nitrogen (NH3-N) were required to be collected at least once a week. Similar composite samples for Ammonia-N, Kjeldahl-N, Nitrate-Nitrite as N and Total Phosphorus were required to be collected at least once a week.

Video surveillance was set up at Benton-Nicholson for the period December 18, 2013 until June 17, 2014. Since the sampling locations for Benton-Nicholson were located within the plant and, therefore, could not be seen, it could not be determined whether samples were actually collected and analyzed when Klepadlo and/or his employee showed up. However, during 146 days of video monitoring, neither Klepadlo nor his employee showed up on 34 occasions. Video surveillance showed that an operator did not show up in December 2013 (after December 18, 2013) on six occasions; in January 2014, four

occasions; in February 2014, seven occasions; in March 2014, five occasions; in April 2014, eight occasions; in May 2014, two occasions; and, in June 2014, until video surveillance ended on June 17, 2014, the operator did not show up on two occasions. Thus, on 34 days, again giving every benefit of the doubt to Klepadlo, the required daily monitoring for two parameters, pH and TRC, did not occur, and false results were submitted to PADEP on DMRs by Klepadlo.

### *Interview with Joseph Sheposh on August 4, 2015*

On August 4, 2015, EPA and FBI agents interviewed Joseph Sheposh, Klepadlo's at-will employee. During the interview, Sheposh told the agents that both he and Klepadlo knew about the daily and composite sampling requirements at both plants, but claimed they did not have time to conduct sampling every day because he was instructed by Klepadlo and Bruce Evans, Sr. (GTSA Manager) to fix grinder pumps throughout Greenfield Township as needed. Sheposh worked for Klepadlo and not Greenfield Township. Sheposh told agents that he discussed writing down false numbers on the DMRs with Klepadlo and that Klepadlo concurred in the practice. In fact, Klepadlo told Sheposh that repairing pumps on behalf of Bruce Evans and Greenfield

Township was a priority over Permit sampling in order to maintain the more than 500 pumps throughout Greenfield Township.[7]

## Environmental Damage/Danger to Human Health

Contrary to Klepadlo's attitude about the insignificance of continued violations of NPDES Permits, observations by PADEP inspectors on numerous occasions at the Greenfield plant over an extended period of time evidence the consequences of continued and repetitive discharges of improperly treated wastewater at the facility outfall. This included the growth of sphaerotilus natans, blood worms (which thrive in polluted water) (both are indicators of improperly treated sewage), raw sewage debris such as condoms and tampon applicators which the plant failed to collect at the beginning of treatment, and insufficient and improper processing/removal of sludge,

---

[7] Bruce Evans, Sr. was indicted on January 8, 2019 and charged with multiple federal violations involving the CWA (33 U.S.C. § 1319) and wire fraud (18 U.S.C. § 1343). It should be further noted that throughout the relevant portion of Klepadlo's contract with Greenfield Township to operate the Greenfield Township wastewater treatment facility (for which he was paid approximately $3,300 monthly and actually received an increase in salary post-indictment), Bruce Evans, Sr. served as the Greenfield Township Sewer Authority Manager, a Greenfield Township Supervisor, and was an employee of both Greenfield Township and the Greenfield Township Sewer Authority.

especially in the chlorine contact tank used for disinfection.  The time

period for purposes of reference is in or about April 2013 through

December 2017.  (SEE ATTACHED PHOTOS MARKED AS: Exhibits 1

and 1.1 (4/16/2013); Exhibit 2 (4/23/13); Exhibits 3, 3.1 and 3.2 (5/20/15);

Exhibits 4, 4.1, 4.2, 4.3, 4.4 and 4.5 (3/15/16); Exhibits 5, 5.1, 5.2, 5.3,

5.4, 5.5, 5.6 and 5.7 (3/16/16);  Exhibits 6, 6.1, 6.2, 6.3, 6.4, 6.5, 6.6 and

6.7 (9/7/16); Exhibits 7, 7.1 and 7.2 (10/17/17); and Exhibits 8, 8.1, 8.2,

8.3 and 8.4 (12/12/17).[8]

## Tampering with a Witness (Count 16)

Klepadlo's employee, Joseph Sheposh, cooperated with

investigators and wore a recording device on multiple occasions to

---

[8]     PADEP Biologist Walter "JR" Holtsmaster made the following statement contained in a PADEP inspection report; "*On April 30, 2013, Jeremy Miller* (PADEP Inspector) *and I arrived at the Greenfield Township Sewer Authority, Lackawanna County at 1130 hours. We walked down to the discharge pipe located outside the fenced area.  I observed filamentous algae and sphaerotilus (sewage fungus) in the discharge channel from the headwall down to the confluence with the unnamed tributary to Dundaff Creek. Bloodworms (Chironomus genus) were also observed in the discharge channel from the headwall to the confluence of the unnamed tributary to Dundaff Creek. The discharge channel was approximately 50 feet in length and braded into two channels. Bloodworms and sphaerotilus were not observed in the unnamed tributary to Dundaff Creek.*"

record conversations between himself and Klepadlo.[9]  The period of recordings included dates in August of 2015 and again in December of 2015.  During recorded conversations, whenever the subject of this investigation came up, Klepadlo repeatedly attempted to thwart Sheposh's cooperation with the Government and/or prevent Sheposh from providing truthful statements to Government agents.  This occurred on multiple occasions.  At first, Klepadlo suggested to Sheposh that he should simply avoid federal agents by not responding to their communications.  "*I can't tell you what to do but I would ignore them if I were you.  Just tell them you're sick and can't come down.*"  Klepadlo instructed Sheposh to feign ignorance when questioned by the FBI. Klepadlo offered to have his attorney accompany Sheposh to any scheduled meetings.  Klepadlo stated, "*….my lawyer laughs about it……what's the big deal?*" Klepadlo goes on to advise Sheposh, "*If they ask you about diluting samples, you should just claim ignorance.*"[10]

---

[9]    All recorded conversations were disclosed to the defendant during the early discovery stages.

[10]    Joseph Sheposh stated during interviews that Klepadlo was fully aware that he was diluting samples in order to feign compliance.

In further attempts to thwart Sheposh's cooperation, Klepadlo attempted to impugn the reputation of a retired PADEP inspector. Klepadlo advised Sheposh to tell investigators that he was instructed by a then retired PADEP inspector that what they were doing was okay. Klepadlo was recorded telling Sheposh to "*point everything to Lenny.*" "*Lenny is retired and the [EPA/FBI] won't involve him.*" Klepadlo instructed Sheposh, "*Just tell them, yeah I only did what Lenny told me to do.*" Klepadlo told Sheposh, to repeatedly say, "*I don't recall.*" Klepadlo further stated, "*We'll just…….say we don't recall and do the Hillary Clinton thing. You don't remember, you don't recall, to the best of your ability. That's all.*" Klepadlo rationalized to Sheposh that going to the plant everyday was "*ridiculous*" and a "*waste of gas and time*" (Klepadlo resided only minutes away from the Greenfield facility by car). In further attempts to influence Sheposh, Klepadlo refers to federal agents (EPA and FBI) as "*stupid*" and not as credentialed as himself.

III.  <u>Procedural History</u>

On September 6, 2016, a grand jury returned a 16-count indictment charging the defendant multiple violations of the Clean

Water Act as well as Tampering with a Witness.  Doc. 1.  On December 20, 2018, Klepadlo, on behalf of himself and DKA, pleaded guilty to Count 4 (submitting false DMRs to PADEP that contained false test results), and Count 16 (tampering with a Government witness).  Docs. 26 and 29.

A draft PSR was disclosed on April 2, 2019.  Doc. 32.  Klepadlo filed multiple objections to the PSR and the Government responded. The objections have not been resolved.  With respect to many of Klepadlo's objections, he is ignoring the law.[11]  For example, he disputes the fact that ammonia is a hazardous substance.  Ammonia is one of the parameters that the CWA permits involved in this case set specific

---

[11]    The two main types of relevant conduct are laid out in subsections 1B1.3(a)(1) and (a)(2). Subsection (a)(1) contains the basic rules of relevant conduct applicable to all offenses. Those provisions provide that, in every case, relevant conduct includes actions of the defendant performed in preparation for the offense, during the offense, and following the offense to avoid detection. Relevant conduct always includes acts the defendant counseled, commanded, induced, procured, or willfully caused. In other words, if the defendant directs someone else to engage in activity, the defendant is responsible for that person's actions as if the defendant did the acts him or herself. In a case of "jointly undertaken criminal activity," the defendant is liable for all acts and omissions of others that were (1) within the scope of the jointly undertaken criminal activity, (2) in furtherance of that criminal activity, and (3) reasonably foreseeable in connection with that criminal activity.

discharge limits for, required permit holders and their contractors to analyze wastewater for, and report accurate results to PADEP.

The EPA has compiled a list of all hazardous substances pursuant to the definition found in the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), commonly referred to as the Superfund statute. 42 U.S.C. § 9601(14). This list, found at 40 C.F.R. § 302.4, contains hazardous substances identified by all environmental statutes, including the Clean Water Act. Ammonia is listed there as a hazardous substance pursuant to the CWA, 33 U.S.C. § 1321(b)(2). 40 C.F.R. § 302.4, Note (Basis for listing Ammonia). However, in an attempt to lessen his culpability, Klepadlo states, "ammonia is *technically* listed as a hazardous substance. . ." (emphasis added), and then attempts to argue away the import of ammonia identified as a hazardous substance. *See* Defendants' Objections p. 3 footnote 1. Because ammonia is a hazardous substance, Section 2Q1.2 is the correct guideline to apply in this case.

Appendix A to the Sentencing Guidelines guides the selection of the appropriate guideline for federal offenses. With regard to violations of 33 U.S.C. § 1319(c)(2) or (4), either Sections 2Q1.2 or 2Q1.3 may

apply.  U.S.S.G. Section 1B1.2(a).  This is because the <u>type of pollutant</u> involved governs which  guideline applies, not the specific offense charged.  *United States v. Van Loben Sels*, 198 F.3d 1161 (9th Cir. 1999) (defendant in CWA case involving discharge of oily wastewater into POTW sentenced under Section 2Q1.2 because wastewater contained benzene, a hazardous substance); *United States v. Hong*, No. 3:99CR269 (E.D. Va.. 2000 ), <u>aff'd on other grounds</u>, 242 F.3d 528 (4th Cir. 2001) (discharges of wastewater to sewer from treatment facility included hazardous substances such as benzene, toluene and xylene so Section 2Q1.2 applied in CWA pretreatment case), *United States v. King*, 915 F. Supp. 244 (D. Kan. 1996) (pollutant discharged in CWA pretreatment case was hazardous substance; therefore, Section 2Q1.2 applied.)  If Section 2Q1.2 applies to crimes in which hazardous or toxic pollutants were discharged into a sewage treatment plant, then it also applies to cases involving discharges from such plants.

Klepadlo is also clearly mistaken in his claim that Section 2Q1.2 has not been applied in cases involving discharges from public sewage treatment plants.  One only has to examine recent prosecutions in Pennsylvania to demonstrate the inaccuracy of this assertion.  See,

*United States v. Mark Ventresca* (W.D. Pa. 16:CD-17) (defendant was licensed wastewater operator who submitted false DMRs containing false test results – subject to U.S.S.G. Section 2Q1.2); *United States v. Matthew Brozena* (E.D. Pa. 15-595-01) (defendant was licensed wastewater operator who pleaded guilty to negligently causing a discharge of hazardous substance including ammonia - subject to U.S.S.G. Section 2Q1.2); *United States v. James Crafton* (E.D. Pa. 15-358) (defendant was licensed wastewater operator who tampered with the required monitoring method (chlorine) – subject to U.S.S.G. Section 2Q1.2).

Moreover, it should be noted that Judge Rambo applied Section 2Q1.2 in a CWA case involving discharges without a CWA permit, only six weeks ago on August 14, 2019. *United States v. Andrew Manganas*, (No. 1:16-CR-209 M.D. Pa.) Like this case, the indictment in Manganas alleged that the defendants had illegally discharged pollutants, without specifying their hazardous or toxic nature. Judge Rambo decided that Section 2Q1.2 applied because some of the pollutants, i.e., paint blasted off an Interstate 81 into the Susquehanna River, contained lead, a CWA

toxic water pollutant and hazardous waste.  She sentenced the defendant to 46 months in prison.

Klepadlo also raised objections to his guideline calculation on matters not addressed in the PSR.  First, he broadly claims that none of the specific offense characteristics contained in Section 2Q1.2 apply to Count 4 because the defendant's long history of false statements to PADEP constitutes a "simple recordkeeping offense" pursuant to Section 2Q1.2(b)(6) and Application Note 2.  This claim lacks any basis in fact or law.

Klepadlo characterizes his repeated submissions of false statements to a state agency delegated the CWA regulatory program as a "technical violation," even though neither he nor his staff had been to the plants every day to take required samples and check on plant operations.  Of course, in his wisdom Klepadlo considered such work unnecessary.  (Defendants' Objections p. 8.)  He also told his employee that taking daily sampling was "impractical," "impossible," and that taking daily pH samples was not a "requirement."  (Defendants' Objections pp. 5-6.)  Kepladlo's repeated lies are not a "technical violations" or a "simple recordkeeping offenses."  Every DMR he signed

put him on notice that providing false information subjected him to criminal prosecution. His long training and work a professional engineer specializing in wastewater treatment design and operation and his licensure as a wastewater treatment operator meant he knew that regulatory agencies rely heavily on the integrity of a permittee's compliance with self-monitoring and reporting requirements.

As demonstrated by the facts in the PSR and the relevant conduct outlined in the Indictment, this is not a "simple recordkeeping offense." The Indictment charged Klepadlo with conspiring to violate the CWA for at least two years, including failing to operate and maintain two public sewage treatment plants, failing to ensure that compliance monitoring was done at these plants in accordance with their CWA permits, and repeatedly signing DMRs which falsely stated that such sampling for a wide variety of parameters – not just pH - had been done. Klepadlo's repeated signing of false DMRs and his filing of the false DMRs were done with one goal in mind: to cover up his substantive permit violations caused by the substitution of his judgment for that of PADEP and/or his failure to hire adequate staff. While Klepadlo continues to claim that daily sampling he failed to

perform was of little consequence, this is beside the point when it comes to his "simple recordkeeping" claim.

The purpose of obtaining a CWA permit is to limit what can be discharged in order to protect human health and the environment. The daily and weekly sampling requirements were bedrock requirements of the CWA permits he lied about because they measured how much pollution was being added to a stream and told PADEP whether the permittees were complying with the law. Klepadlo clearly still thinks he knows better than regulators about monitoring since he has regularly proclaimed that testing daily (or even weekly given the lack of staff visits to the plants for days on end) is a waste of time and money, since he would have had to pay for more staff to do it or do it himself.[12]

Section 2Q1.2(b)(5) makes clear that when "a recordkeeping offense reflected an effort to conceal a substantive environmental offense," one uses the offense level for the substantive offense. Contrary to Klepadlo's claim in Defendants' Objections, neither he nor his staff

_____

[12] Klepadlo controlled the staffing for his company. Sheposh was Klepadlo's employee. If more staffing was needed to comply with the plants' permits, Klepadlo could have provided more staffing. Of course, that would require less profits for Klepadlo.

were at the plant several times a week. Video evidence demonstrates this to be true. Klepadlo lied to cover up his mismanagement of the plants through cutting corners in staffing and his repeated violations of the CWA permits in multiple ways. Therefore, the specific enhancements contained in 2Q1.2 were properly addressed in the draft PSR. *United States v. Hagerman*, 525 F. Supp. 2d 1058 (S.D. Ind. 2007), aff'd, 555 F.3d 553 (5th Cir. 2009) (per curiam).

Klepadlo also claims that the Probation Office should apply the "guided departures" contained in application Notes 5 (repetitive discharge) and 8 (violation of a permit) to Section 2Q1.2. These permit a court to depart one to two levels upward or downward for each enhancement. These are issues properly raised by Klepadlo, but the Government does not believe that such departures are warranted. *United States v. West Indies Transport, Inc.*, 127 F.3d 299 (3d Cir. 1997) (district court imposed a six-level enhancement for discharge of sewage into a waterway. The Third Circuit rejected argument that the district court had erred in not granting a two-level guided departure because human sewage was "fully biodegradable.").

Klepadlo claims that there is nothing in the record to show "actual environmental harm." Defendants' Objections p. 8. First, his claim is contrary to a long line of cases holding that showing a discharge into the environment is sufficient to show environmental contamination. *See United State v. Chau*, 293 F.3d 96 (3d Cir. 2002) for list of cases on issue; *United States v. Perez*, 366 F.3d 1178 (11th Cir. 2004); *United States v. Ho*, 311 F.3d 589, 610 n.25 (5th Cir. 2002). Thus, Klepadlo's acknowledgement that he discharged wastewater that had not been properly tested is an admission that polluted wastewater reached waters of the United States in violation of the relevant CWA permits. *United States v. Hagerman,* 525 F.Supp.2d 1058 (S.D. Ind. 2007), aff'd, 555 F.3d 553 (5th Cir. 2009) (per curiam),

In making his argument, Klepadlo focuses primarily on one aspect of this case – his failure to ensure that pH samples were taken daily. He ignores his failure to take other samples required to be taken daily, such as Dissolved Oxygen, and his failure to take weekly composite samples for various parameters over a period of months, such as ammonia. He also ignores his failure to operate the plants properly as required by the CWA permits. His narrow focus unsurprisingly is

also reflected in his consultant's report submitted as Attachment A to Defendants' Objections.

In sum, both Klepadlo and his consultant failed to consider relevant conduct, including the many, many days no one went to the plants at all to sample or otherwise ensure they were operating properly, and the clear failure to properly operate and maintain the plants. This failure is documented in evidence collected by PADEP (attached photographs) showing a heavy growth of *sphaerotilus natans* at the Greenfield plant's discharge point. This is an aquatic bacterium associated with polluted water also known as sewage fungus. Moreover, PADEP observed a build-up of solids and debris, such as condoms and personal hygiene applicators, on the bottom of the stream and on the banks. Consequently, the Government does not believe Klepadlo is entitled to any amount of guided departure under either enhancement.

## IV.   Section 3553(a) Factors

The United States believes the correct Guideline imprisonment range in this case is 37 – 46 months.[13]  The Court must consider:  the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to promote the goals of sentencing; the kinds of sentences available; the sentencing guideline range; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

---

[13]     In the Government's view, Klepadlo's sentencing guideline calculation pursuant to Section 2Q1.2 and Chapter 3 should be:

| | |
|---|---|
| Base Offense Level – 2Q1.2(a) | 8 |
| Repetitive, Ongoing or Continuous Discharge – 2Q1.2(b)(1)(A) | +6 |
| Violation of a Permit – 2Q1.2(b)(4) | +4 |
| Adjustment for Role in the Offense – 3B1.1 | +2 |
| Adjustment for Abuse of Position of Trust – 3B1.3 | +2 |
| Adjustment for Obstruction of Justice – 3C1.1 | +2 |
| TOTAL | 24 |

This assumes full acceptance of responsibility which the Government has concerns about and will await the nature of any further arguments from Klepadlo.  The United States reserves the right to object at sentencing to Klepadlo receiving any credit for acceptance of responsibility.

guilty of similar conduct; and the need to provide restitution to any victims of the offense.

1. <u>Nature and circumstances of the offenses</u>

Klepadlo engaged in serious offenses. As a certified wastewater treatment operator and owner of DKA, Klepadlo knew about the Clean Water Act and the requirements of NPDES permits, and was responsible for complying with the permits and ensuring the compliance of his employee. The NPDES program and the safety of the waters of the United States depends on the integrity of wastewater treatment operators, and in particular certified wastewater treatment operators, to be knowledgeable of and comply with their permits and to honestly sample, test, and report the pollutants discharged so that PADEP is notified of problems and can address them. Klepadlo knowingly and intentionally violated the permits by failing to comply with the testing requirements of the permits he was paid to enforce. The resulting discharges from the plants Klepadlo operated were repeated and continuous discharges of hazardous and other pollutants. His failure to properly operate the plant, part of the manner and means of the

conspiracy, resulted in demonstrable impacts to the receiving stream at Greenfield.

It bears repeating that <u>NPDES permits are specific to each treatment facility</u> and regulate pollutants and describe the terms and conditions that a permit holder must meet in order to discharge properly treated wastewater. The program requires permit holders to participate in a <u>self-monitoring program</u> where they must collect samples and conduct analysis on the effluent produced by the permitted facility. The <u>heart of the program is self-monitoring</u>. Any failure in regards to self-monitoring (such as fraudulent, inaccurate or misleading results) destroys public confidence in this type of program to effectively protect our waterways. Moreover, Klepadlo clearly believes he is the expert in this area, the PADEP regulators are beneath him, and that he can choose which parts of a permit he needs to comply with on any give day depending on the demands of his business and staffing rather than the requirements of the law.

It also bears reminding the Court of Klepadlo's repeated acts of attempts to obstruct and thwart justice in this case, to protect himself at the expense of other individuals as well as the environment.

## 2. History and characteristics of the defendant

In addition to the above descriptions of Klepadlo's defiance and arrogance, Klepadlo was licensed by the Commonwealth of Pennsylvania as a certified wastewater treatment plant operator. He had approximately 20 years of operator experience. Greenfield Township and Benton-Nicholson Joint Sewer Authority contracted with Klepadlo and DKA for a licensed wastewater treatment plant operator to manage its plants. The municipalities relied on Klepadlo and his touted expertise and credentials. In repeated acts of defiance and greed, Klepadlo violated the trust of the communities who paid his salary. He also engaged in a pattern of disrespect for the law.

David D. Klepadlo and Associates (DKA) is a Pennsylvania corporation whose criminal conduct involved its contract operations at the Greenfield Township and the Benton-Nicholson plants. With respect to fines, the CWA sets a range for any criminal fine imposed upon any corporation for knowing violations of a NPDES permit from $5,000 to $50,000 for each day of violation. 33 U.S.C. § 1319(c)(2).

Under the Alternative Fines Act (AFA), the court could impose fines against DKA of up to the greater of 1) the statute of conviction

(aforementioned CWA maximum fines), 2) $500,000 for a felony or, 3) the amount calculated to be twice any "pecuniary gain" to defendant or twice the "pecuniary loss" caused by defendant's conduct, such as loss suffered by his clients through fraud. 18 U.S.C. §§ 3571(c), (d).

### 3. <u>Need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment</u>

Klepadlo's employment with the local municipalities was based primarily on his own advertised experience and credentials. He made himself well known in the area as the plant operator for the identified wastewater treatment facilities. For years, he lied to PADEP on monthly DMRs, and failed to inspect the Greenfield plant on 108 out of 116 days in 2014. He lied to board members and he lied to members of the community he was paid to protect. Instead, he cheated them. His victims are the communities he was paid to protect.

Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical and biological integrity of the Nation's waters" by reducing and eliminating water pollution. 33 U.S.C. § 1251(a). Much progress to protect the Nation's waters has been made since then, but strong sentences must be imposed in cases like this to continue to protect the environment. It is essential to protect the health

of the local tributaries and streams that ultimately flow from the Dundaff Creek into the Tunkhannock and then into the Susquehanna River where communities thrive and enjoy water activities. Klepadlo's repeated and defiant actions resulting in the cumulative effect of partially untreated discharges into the waterways, and his failure to take daily samples simply because he knew better than PADEP and did not want to hire adequate staff, must be taken into account for sentencing.

One way of protecting our critical waterways is to deter businessmen and others from polluting them and ignoring the fundamental concept that all people in the United States deserve a clean environment. The sentence in this case must be severe enough to punish Klepadlo for cheating the member of the local communities, all of whom depended on him to comply with the permits issued, and for befouling the environment.

4. <u>Need to deter future criminal conduct and protect the public</u>

Klepadlo's sentence needs to accomplish the twin goals of deterring him from engaging in future criminal conduct and protecting the public. While hopefully Klepadlo will never be employed again as a

certified wastewater treatment facility operator, he was a serial violator of the law.  An appropriate sentence will help deter him from future criminal conduct of any kind.  It will also serve to protect the public by deterring others from engaging in similar flouting of environmental laws, cheating communities, and lying to regulators.

5.  <u>Need to avoid unwarranted sentencing disparities</u>

The appropriate sentence of a term of imprisonment will not result in unwarranted sentencing disparities.  As for DKA, any fine imposed within the PSR's calculated range is appropriate given the severity of the offenses.  Given Klepadlo's offenses and relevant facts, especially Klepadlo's total control of the criminal activity engaged in by him, a term of imprisonment is appropriate.  The United States asks the Court to sentence Klepadlo to a term of imprisonment of 37 months. The Government has not identified any factors that would warrant a departure or variance from the applicable sentencing guidelines.  As such, the need to avoid unwarranted sentence disparities clearly weighs in favor of a sentence of imprisonment, an individual fine given his ability to pay, and a fine on the corporate defendant of $150,000.

## V.    Conclusion

The United States respectfully requests that the Court impose a period of imprisonment of 37 months on defendant, Klepadlo.   The United States also asks that Klepadlo and DKA be fined in accordance with their ability to pay a fine, which appears to be significant.

Respectfully submitted,

DAVID J. FREED
United States Attorney

/s/ Michelle L. Olshefski
MICHELLE L. OLSHEFSKI
Assistant U.S. Attorney
Atty ID No. PA 79643
Michelle.olshefski@usdoj.gov

/s/ Martin Harrell
MARTIN HARRELL
Special Assistant U.S. Attorney
WV1609
Harrell.Martin@epa.gov

235 North Washington Avenue
Scranton, PA  18503
(570) 348-2800

Date: September 24, 2019