1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
UNITED STATES OF AMERICA,    )
                             )
              Plaintiff      )
         vs                  )    16-CR-254
                             )
DAVID D. KLEPADLO,           )
                             )
              Defendant      )
_____)
```

TRANSCRIPT OF PROCEEDINGS
SENTENCING OBJECTIONS
BEFORE THE HONORABLE A. RICHARD CAPUTO
MONDAY, SEPTEMBER 30, 2019; 10:00 A.M.
WILKES-BARRE, PENNSYLVANIA

FOR THE GOVERNMENT:
    MICHELLE OLSHEFSKI, ESQ.
    Assistant United States Attorney
    P.O. Box 309
    235 N. Washington Avenue
    Scranton, Pennsylvania  18503
-AND-
    WARREN M. HARRELL, ESQ.
    U.S. Environmental Protection Agency
    1650 Arch Street
    Philadelphia, Pennsylvania  19103

FOR THE DEFENDANT:
    MARK B. SHEPPARD, ESQ.
    Klehr Harrison Harvey Branzburg LLP
    1835 Market Street, Suite 1400
    Philadelphia, Pennsylvania  19103
-AND-
    TIMOTHY J. BERGERE, ESQ.
    Montgomery, McCracken, Walker & Rhoads, LLP
    1735 Market Street, 21st Floor
    Philadelphia, Pennsylvania  19103-7506

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

_____

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

10:05AM 1    THE COURT:  As far as today's sentencing concerned, there

10:05AM 2 are multiple objections that need to be resolved, and frankly,

10:05AM 3 there's a lot of documents that have come along lately. So what

10:05AM 4 we're going to do today is we will deal with the objections and

10:05AM 5 we're going to reschedule this sentencing for another day.

10:05AM 6    But we will deal with the objections, and we will see where

10:05AM 7 we are at the end of that. I may or may not make a ruling on

10:05AM 8 that now or issue an opinion regarding same. I don't know which

10:05AM 9 way we're going to go. This hearing will determine where we are

10:05AM 10 at that point. Okay?

10:05AM 11    MR. SHEPPARD: Yes, Your Honor.

10:05AM 12    THE COURT: There is two sentencing memoranda, a

10:05AM 13 Pre-Sentence Report regarding this offense, one on

10:06AM 14 behalf -- one regarding Mr. Klepadlo and the other the

10:06AM 15 corporation, and there have been a variety of documents

10:06AM 16 submitted, the sentencing memoranda also I received, but

10:06AM 17 there's a Board Resolution of Greenfield Township Sewer

10:06AM 18 Authority. Does everybody have a copy of that?

10:06AM 19    MR. SHEPPARD: I received it this morning, Your Honor?

10:06AM 20    THE COURT: As did I.

10:06AM 21    MS. OLSHEFSKI: Yes, Your Honor.

10:06AM 22    THE COURT: So let's deal with the objections that have been

10:06AM 23 filed.

10:06AM 24    Essentially, the major objection is the question involving

10:07AM 25 Paragraph 24 of the Pre-Sentence Report, which is the inclusion

3

10:07AM 1  of the enhancement for toxic substances, and I'll hear from

10:07AM 2  counsel Mr. Sheppard regarding their position.

10:07AM 3      MR. SHEPPARD: Yes, good morning, Your Honor. Mark Sheppard

10:07AM 4  on behalf of David Klepadlo. With me is my co-counsel Tim

10:07AM 5  Bergere and the newly admitted Ms. Lowry.

10:07AM 6      Your Honor, if I may, just as a matter of housekeeping, we

10:07AM 7  got the amended PSR, I guess, late Thursday or Friday. There is

10:07AM 8  just two factual corrections that I have spoken with the

10:07AM 9  Probation Officer about, I'd like to get it on the record, just

10:07AM 10 so we have a clean record with regard to that.

10:07AM 11     Your Honor, I would direct the Court to Paragraph 62 on

10:08AM 12 Page 15 of the amended PSR.

10:08AM 13     THE COURT: All right.

10:08AM 14     MR. SHEPPARD: Your Honor, there, there's a paragraph at the

10:08AM 15 bottom that relates to the income of the Defendant's business,

10:08AM 16 David D. Klepadlo and Associates, which also has pled guilty to

10:08AM 17 the one count of filing false statements.

10:08AM 18     Your Honor, I simply wish to point out that the income

10:08AM 19 numbers that are reported there are gross income numbers. I

10:08AM 20 confirmed that with Mr. Zdaniewicz, and, Your Honor, the net

10:08AM 21 income number for 2017, which reported a gross amount of

10:08AM 22 $67,116, was actually $5240, based upon the tax return that was

10:08AM 23 filed.

10:08AM 24     And, Your Honor, they're not stated there, but in 2018, the

10:09AM 25 Defendant reported gross income through his business of $12,000

**4**

10:09AM 1   and reported a net loss of $8,000. And as noted in the

10:09AM 2   objections, which were attached to the addendum, Your Honor,

10:09AM 3   that was primarily as a result of the fact that the consulting

10:09AM 4   business, David Klepadlo and Associates, voluntarily

10:09AM 5   relinquished -- Mr. Klepadlo voluntarily relinquished his

10:09AM 6   Certificate to be a Sewage Treatment Plant Operator, pursuant

10:09AM 7   to the plea agreement, and, therefore, lost all four of the

10:09AM 8   contracts that he had. So there was very limited income coming

10:09AM 9   into the business, and I wanted to point that out.

10:09AM 10        The other objection, Your Honor, that factually needed to

10:09AM 11  be resolved is with regard to Paragraph 63 on the next page,

10:09AM 12  which is the Defendant's Statement of Assets. This is just a

10:09AM 13  typographical error, and I apologize to Mr. Zdaniewicz because

10:09AM 14  I didn't point it out sooner, the asset numbers there and also

10:09AM 15  the income numbers there, Your Honor, are numbers for Mr.

10:10AM 16  Klepadlo's entire household, both he and his wife.

10:10AM 17        You would note, Your Honor, that on the income numbers,

10:10AM 18  there's actually a line item for Linda Klepadlo's income at the

10:10AM 19  top of Page 17.

10:10AM 20        Again, I spoke with the Probation Officer about that this

10:10AM 21  morning, and he concurs that these are, in fact, numbers for

10:10AM 22  both Mr. Klepadlo and his wife. Just so the record is clear and

10:10AM 23  the PSR is accurate, Your Honor. I don't expect that we are

10:10AM 24  going to ultimately be -- depending where the guideline range

10:10AM 25  comes out and, ultimately, what the Court decides, with regard

10:10AM 1   to this restitution issue -- it may or may not become a

10:10AM 2   question of the ability to pay.

10:10AM 3       THE COURT: So the statement that the amounts reflect Mr.

10:10AM 4   Klepadlo's one-half interest is not so?

10:10AM 5       MR. SHEPPARD: That is correct, Your Honor, it is their

10:10AM 6   joint interest.

10:10AM 7       THE COURT: All right.

10:10AM 8       MR. SHEPPARD: So I think if you add the word, not, Your

10:11AM 9   Honor, I think we're good to go.

10:11AM 10       THE COURT: Thank you.

10:11AM 11       MR. SHEPPARD: So those were the only factual objections we

10:11AM 12   had, Your Honor, to the amended Pre-Sentence Report. And as

10:11AM 13   Your Honor pointed out, we do have a number of legal objections

10:11AM 14   to the guideline computation.

10:11AM 15       THE COURT: Let's deal with those.

10:11AM 16       MR. SHEPPARD: Thank you, Your Honor. With regard to the

10:11AM 17   first issue, as Your Honor pointed out, the issue is the

10:11AM 18   application of the guideline range here, whether it's 2(q)1.2,

10:11AM 19   which relates to discharges for toxic and hazardous substances

10:11AM 20   or 2(q)1.3, which relates to the discharge of a pollutant, in

10:11AM 21   violation of a permit. Both of these offenses also address the

10:11AM 22   record-keeping offense to which Mr. Klepadlo and the entity

10:11AM 23   pled guilty.

10:11AM 24       Your Honor, as we stated in our Sentencing Memo and also in

10:11AM 25   the objections that were attached to the PSR, it is our

10:11AM **1**   position that the proper guideline is 2(q)1.3. And, Your Honor,

10:11AM **2**   the reason that it's important is it's a base offense level of

10:12AM **3**   6 versus a base offense level of 8 for the toxic and hazardous

10:12AM **4**   substance.

10:12AM **5**        Your Honor, the argument that we have set forth is,

10:12AM **6**   essentially, that the Court needs to look to the count of

10:12AM **7**   conviction in deciding the guideline range, and that the

10:12AM **8**   statutory basis and the basis for the plea here, Your Honor,

10:12AM **9**   is, essentially, that Mr. Klepadlo and the company have pled

10:12AM **10**  guilty to filing false statements relating to the failure to

10:12AM **11**  properly test daily for the items at the two plants, DO and pH.

10:12AM **12**  And, also, at Benton Nicholson, I believe it was just pH.

10:12AM **13**       Your Honor, it is our position that when you look at the

10:12AM **14**  count of conviction here, you're talking about a discharge from

10:12AM **15**  a sewage treatment plant, in violation of a permit because the

10:12AM **16**  testing was not done, which does not, Your Honor, equate to the

10:12AM **17**  discharge of a toxic or hazardous substance.

10:12AM **18**       Your Honor, we would also make the argument under the Clean

10:13AM **19**  Water Act, in response to the Government's position that

10:13AM **20**  ammonia is a hazardous or toxic substance, that, number one,

10:13AM **21**  under the Clean Water Act itself, which is the offense to which

10:13AM **22**  he has pled guilty, ammonia is listed as a pollutant and not a

10:13AM **23**  toxic or hazardous substance.

10:13AM **24**       With regard to sewage treatment plants, themselves, we

10:13AM **25**  argue that in every single case that we found, reported or

10:13AM 1 unreported in the country, that involved the discharge of

10:13AM 2 sewage from a sewage treatment plant, 2(q)1.3 was the guideline

10:13AM 3 that was applied.

10:13AM 4     And, Your Honor, the reason for that, we submit, is that

10:13AM 5 with regard to municipal waste, and, in particular, the

10:13AM 6 municipal waste that came from these two rather small plants,

10:13AM 7 ammonia and ammonia nitrogen -- and we do have Mr. Long here

10:13AM 8 who can testify to this -- Your Honor, are natural components

10:13AM 9 of sewage treatment. This is not a situation where you had a

10:14AM 10 discharge where someone was pouring ammonia into a stream or

10:14AM 11 that you were discharging from a toxic plant or that you were

10:14AM 12 discharging from a commercial plant.

10:14AM 13     Your Honor, the three cases that the Government relies

10:14AM 14 upon, we believe, are inapposite. One of them relates to lead

10:14AM 15 paint being discharged into a river. I don't think anyone is

10:14AM 16 going to argue that that's a toxic substance.

10:14AM 17     The other two, Your Honor, one related to discharges from a

10:14AM 18 slaughterhouse involving chicken processing. Again, I don't

10:14AM 19 believe anyone is going to argue that discharges from a chicken

10:14AM 20 slaughterhouse would involve toxic substances.

10:14AM 21     Here, Your Honor, we have a naturally-occurring component

10:14AM 22 of sewage treatment, every single sewage treatment plant in the

10:14AM 23 country, big or small, discharges ammonia nitrates or ammonia

10:14AM 24 nitrogen, and, therefore, Your Honor, to say that this offense

10:14AM 25 should be subject to the guideline which is reserved for the

10:15AM 1    most serious and hazardous and toxic discharges is a

10:15AM 2    substantial overstatement, and it overstates, frankly, the

10:15AM 3    seriousness of this offense.

10:15AM 4        Particularly, Your Honor, where we are talking about a

10:15AM 5    record-keeping violation, where Mr. Klepadlo has pled guilty to

10:15AM 6    the failure to monitor and oversee the proper testing at these

10:15AM 7    two facilities.

10:15AM 8        Your Honor, I would refer, also, to our memoranda, where we

10:15AM 9    cite a number of cases, at least, nine or ten separates places

10:15AM 10   where 2(q)1.3 was applied involving a sewage treatment plant or

10:15AM 11   the discharge of sewage, both either raw sewage or even treated

10:15AM 12   sewage. Again, Your Honor, that's an important point here. We

10:15AM 13   are talking about treating sewage coming out of these plants.

10:15AM 14   These are not untreated discharges.

10:15AM 15       So, again, Your Honor, under the Clean Water Act and, also,

10:15AM 16   given that we're talking about these sewage treatment plants,

10:16AM 17   we submit 2(q)1.3 is the proper guideline range.

10:16AM 18       THE COURT: All right. Counsel.

10:16AM 19       MR. HARRELL: Good morning, Your Honor. My name is Warren

10:16AM 20   Harrell, I'm a Special Assistant United States Attorney from

10:16AM 21   the United States Environmental Protection Office in

10:16AM 22   Philadelphia.

10:16AM 23       There's truly a question of law, here, to begin with. Is

10:16AM 24   ammonia a hazardous substance? The permits, in this case -- and

10:16AM 25   I'm pretty confident I agree with Mr. Sheppard --

10:16AM 1     THE COURT: I don't mean to interrupt you, but is there a

10:16AM 2 distinction between hazardous and toxic?

10:16AM 3     MR. HARRELL: Yes. It's not a toxic water pollutant, I agree

10:16AM 4 with Mr. Sheppard, it's been listed under the different section

10:16AM 5 of the Clean Water Act Section 311 as a hazardous substance.

10:16AM 6 It's on the list of hazardous substances in 40 CFR 302.4, I

10:16AM 7 believe is the correct cite, we have it in our sentencing memo.

10:17AM 8     So the legal question really is, is ammonia a hazardous

10:17AM 9 substance or isn't it? If it's a hazardous substance, then,

10:17AM 10 2(q)1.2 applies if the offense conduct in this case and the

10:17AM 11 relevant conduct involved the discharge of ammonia.

10:17AM 12     If you look at the indictment, the wide-ranging conspiracy

10:17AM 13 that was alleged in Count 1 and all the substantive Clean Water

10:17AM 14 Act charges have to do with, among other things, not taking

10:17AM 15 daily or weekly composite samples at both plants. Composite

10:17AM 16 samples were required for ammonia nitrogen.

10:17AM 17     Failure to operate the plant. We have a witness from DEP

10:17AM 18 who would talk about the effects of improper operation and the

10:17AM 19 actual discharge of these pollutants into the receiving waters

10:17AM 20 in this case at Greenfield and the tributary of Dundaff Creek.

10:17AM 21     So, legally, ammonia is a hazardous substance. The factual

10:17AM 22 question of whether it applies in this case, as we believe it

10:17AM 23 does, because the permit required the monitoring for ammonia

10:18AM 24 nitrogen, ammonia nitrogen was being discharged from the plant,

10:18AM 25 it wasn't being totally removed by the treatment system, and

10:18AM 1    whether the plant was discharging treated wastewater is a core

10:18AM 2    question that the parties disagree about because, you don't

10:18AM 3    show up for 116 days out of a little bit more than six months,

10:18AM 4    to actually have a human being at the plant, it's not going to

10:18AM 5    run properly.

10:18AM 6         So that's the Government's position.

10:18AM 7         THE COURT: So is there disagreement about whether or not

10:18AM 8    ammonia nitrate was a discharged or not? Is there agreement

10:18AM 9    about that?

10:18AM 10        MR. SHEPPARD: Your Honor, we are in agreement with that.

10:18AM 11   It is a permanent substance that is always discharged from

10:18AM 12   every sewage treatment plant. What we disagree about is whether

10:18AM 13   or not there were any exceedances, other than the ones our

10:18AM 14   client actually recorded, with regard to ammonia. And, Your

10:18AM 15   Honor, there is no evidence of any exceedances beyond the

10:19AM 16   permitted limits. The permits themselves, Your Honor, allow for

10:19AM 17   the discharge of ammonia nitrogen. They allow two different,

10:19AM 18   depending on the time of year.

10:19AM 19        Your Honor, our position is that the offense of conviction

10:19AM 20   here, the failure to oversee the proper testing and the

10:19AM 21   submission of false reports. Again, Mr. Klepadlo has not pled

10:19AM 22   guilty to a substantive violation here. This is a

10:19AM 23   record-keeping violation, and that was negotiated as part of

10:19AM 24   the plea agreement.

10:19AM 25        So, Your Honor, we don't disagree that ammonia nitrogen was

10:19AM  1    discharged, what we disagree about, Your Honor, is that it was

10:19AM  2    never discharged in any kind of harmful or dangerous amounts.

10:19AM  3    There is no evidence that there was any discharge in violation

10:19AM  4    of the permitted limits here.

10:19AM  5         So, Your Honor, our position is -- and I would cite the

10:19AM  6    Court specifically to --

10:19AM  7         THE COURT: Before you do that, let me get this straight. So

10:19AM  8    what we're saying -- what everyone is saying here is it was

10:19AM  9    discharged, but we don't know if there were any violations in

10:20AM 10    the discharge amount or intensity, because these tests or

10:20AM 11    records were not kept? Is that right? Am I phrasing that

10:20AM 12    properly?

10:20AM 13         MR. HARRELL: Yes, Your Honor. I would say it's impossible

10:20AM 14    to know if things were being discharged illegally, because he

10:20AM 15    wasn't doing the required testing and then lying to the DEP

10:20AM 16    about making up results.

10:20AM 17         THE COURT: But we're going a step further, aren't we? We're

10:20AM 18    saying, because those tests weren't done, you're concluding

10:20AM 19    that it was a violation, in terms of the amount that was

10:20AM 20    discharged?

10:20AM 21         MR. HARRELL: It was a violation of the permit not to do the

10:20AM 22    sampling. An effluent limit -- a numerical limit in the permit

10:20AM 23    is no different kind of permit requirement than the requirement

10:20AM 24    to do sampling, the required requirement to do operation and

10:21AM 25    maintenance, the requirement to honestly report data. They're

**12**

10:21AM  1   all core ingredients of the permit.

10:21AM  2        So the substantive violation here is not doing the

10:21AM  3   sampling, lying about the sampling, and I would just point out

10:21AM  4   that Mr. Long, the Defendant's expert, in his report, relies on

10:21AM  5   DEP sampling that was done at both plants between 2012 and

10:21AM  6   2016, which is only seven samples over a little bit more than

10:21AM  7   four years. Three of those seven samples showed exceedances of

10:21AM  8   the instantaneous max for ammonia.

10:21AM  9        So to say there's no evidence of illegal discharges is not

10:21AM  10  accurate.

10:21AM  11       MR. SHEPPARD: Your Honor, if I may respond, and then same

10:21AM  12  going to ask Mr. Bergere to respond to the last point because

10:21AM  13  it's an important one.

10:21AM  14       First off, Your Honor, under 1(b)1.2(a) of the guidelines,

10:21AM  15  the guidelines require that the count of conviction, not the

10:21AM  16  relevant conduct, be used to determine the offense guideline.

10:22AM  17  That is clear. What they're talking about here -- first off, I

10:22AM  18  don't agree that's relevant conduct for this offense, but

10:22AM  19  assuming that it is, you still need to look to the count of

10:22AM  20  conviction to make the determination under 1(b)1.2(a) of what

10:22AM  21  is the proper guideline range .

10:22AM  22       Your Honor, the offense of conviction, the statutory or the

10:22AM  23  factual basis for the plea was all about Mr. Klepadlo as a

10:22AM  24  responsible officer failing to oversee his employee, a

10:22AM  25  Certified Treatment Plant Operator to do the proper testing.

10:22AM  1  That's what he admitted to, as far back as 2013, to DEP, it's

10:22AM  2  what he admitted to to Mr. Wetland and Mr. Burgess, when they

10:22AM  3  interviewed him in 2015, even before these charges were filed,

10:22AM  4  and that's why he pled guilty. What he hasn't pled guilty to is

10:22AM  5  the substantive offenses that Mr. Harrell was talking about.

10:23AM  6      And under the guidelines, as a matter of law, you must look

10:23AM  7  to the count of conviction, unless there was a specific

10:23AM  8  stipulation to a guideline range, and, clearly, Your Honor,

10:23AM  9  that is not what occurred here. So that is one point, Your

10:23AM 10  Honor. I would cite the case Watterson v. United States. It's

10:23AM 11  on Page 10 of our sentencing memo.

10:23AM 12      The second point, Your Honor, is the argument that Mr.

10:23AM 13  Harrell makes about ammonia exceedances is just a little

10:23AM 14  misleading, because under the permit, Your Honor -- and Mr.

10:23AM 15  Bergere can explain this better than I can -- but under the

10:23AM 16  permit, Your Honor, this was a weekly composite sample of

10:23AM 17  ammonia that was supposed to be conducted, again, it was not

10:23AM 18  the daily sampling to which my client admitted they didn't do.

10:23AM 19      And, Your Honor, what they're talking about is an

10:23AM 20  instantaneous max, which is a grab sample, and that is

10:23AM 21  different from the sample that was required under the permit.

10:24AM 22  And Mr. Bergere can address that, Your Honor.

10:24AM 23      MR. BERGERE: Your Honor, that is fundamentally correct. The

10:24AM 24  permit, actually, has two limits for ammonia. There's a loading

10:24AM 25  on the screen that is calculated at the monthly average, and

10:24AM 1   the composite samples are taken weekly to determine whether

10:24AM 2   there's been an exceedance of monthly average. A grab sample

10:24AM 3   doesn't determine that. In fact, the limits under the permit

10:24AM 4   are less than the EPA and World Health Organization limits for

10:24AM 5   human exposure and drinking water, the limits of these permits.

10:24AM 6        So they don't translate to any kind of environmental harm

10:24AM 7   in the screening, which is the larger focus of Mr. Long's

10:24AM 8   testimony. He's focused more on, were these little exceedances

10:24AM 9   here and there a number of which were self-reported and which

10:24AM 10  were not untypical as grab samples of wastewater treatment

10:24AM 11  plants, did they cause environmental harm?

10:24AM 12       It's kind of like charging -- asking for an enhancement for

10:24AM 13  a bank robber because he had gasoline in his tank in his

10:25AM 14  get-away car and gasoline has benzene in it, so let's do an

10:25AM 15  enhancement because there's hazardous substances in his vehicle

10:25AM 16  and they came out in the exhaust.

10:25AM 17       Treatment plants operate all the time -- this is not a

10:25AM 18  manufacturing plant, they don't bring ammonia there, they don't

10:25AM 19  emit it, except in connection with the operation of the

10:25AM 20  treatment plant. And there's no samples that have been provided

10:25AM 21  that establish harm, even though, every once in a while, there

10:25AM 22  may have been an occasional exceedance with a grab sample,

10:25AM 23  which is not part of the loading and determination as to

10:25AM 24  whether there's any environmental harm involved from the

10:25AM 25  emission of or discharge of ammonia.

10:25AM 1   And the flow. The flow at this treatment plant is -- this

10:25AM 2   permit has authorized 140,000 gallons a day, the plant

10:25AM 3   discharges a fraction of that, perhaps, 40 at most, 60 percent

10:25AM 4   of that. So there's almost no chance -- in fact, the expert

10:25AM 5   would tell you -- there isn't a chance that the plant could

10:25AM 6   have exceeded any of the in-stream values that are set forth in

10:25AM 7   the permit.

10:25AM 8   THE COURT: All right.

10:26AM 9   MR. HARRELL: Your Honor, I'll just try not to repeat what I

10:26AM 10  said before, but the question you posed is whether 2(q)1.2

10:26AM 11  applies to this case. The question of harm is the guided

10:26AM 12  departure issue, which is down the road in the guidelines

10:26AM 13  analysis, but ammonia is a hazardous substance. The plant was

10:26AM 14  authorized to discharge ammonia within certain limits.

10:26AM 15  There's no question, no dispute that you heard that ammonia

10:26AM 16  was discharged here, and their sampling shows that there were

10:26AM 17  ammonia exceedances, and we don't know for many, many, many

10:26AM 18  days how the plant was operating and whether it was discharging

10:26AM 19  ammonia in excess of permitted limits, because there was no

10:26AM 20  sampling being done. Sampling reporting are just as much a

10:26AM 21  substantive part of the permit as numerical effluent. Thank

10:26AM 22  you, Your Honor.

10:26AM 23  MR. BERGERE: But as has been pointed out, and as pointed

10:26AM 24  out in the papers, 2(q)1.3 is the one that's typically applied

10:26AM 25  in sewage cases, because the Department, EPA and everybody else

10:27AM 1   treats sewage -- it's not -- these as non-conventional

10:27AM 2   pollutants in wastewater treatment plants, it's not a

10:27AM 3   manufacturing plant.

10:27AM 4       And the cases where 2(q)1.2 are applied are for industrial

10:27AM 5   discharges or other kinds of operations, the lead paint that we

10:27AM 6   talked about, they're really toxic discharges that those

10:27AM 7   provisions are used for those bad, really a lot of them

10:27AM 8   unpermitted, completely unpermitted discharges, and EPA is

10:27AM 9   asking to export that provision to apply to treatment plants,

10:27AM 10  which it's not done in the past and which the Courts have not

10:27AM 11  done in the past.

10:27AM 12      THE COURT: All right.

10:27AM 13      MR. SHEPPARD: One more point, Your Honor. That's why,

10:27AM 14  actually, in the indictment in this case, the Government

10:27AM 15  alleged discharge of the pollutant ammonia nitrogen in

10:27AM 16  Paragraph 17 of the indictment.

10:27AM 17      MR. HARRELL: Your Honor, I'll just point out that that's

10:27AM 18  the statutory element that has to be proven, and so the

10:27AM 19  indictment tracked the language of the indictment.

10:27AM 20      THE COURT: I would understand that. Is there anything else

10:27AM 21  on this issue?

10:28AM 22      MR. SHEPPARD: No, I don't believe so, Your Honor, other

10:28AM 23  than I would just point out that, again, it's the Government's

10:28AM 24  burden, with regard to showing the application of a particular

10:28AM 25  guideline and the relevant conduct here. I don't believe they

10:28AM 1   met that burden, again, because we don't believe there's any

10:28AM 2   evidence, Your Honor, of any discharge here that arises from

10:28AM 3   the count of conviction, which is the cornerstone and the

10:28AM 4   touchstone for the determination of proper guidelines.

10:28AM 5       THE COURT: Is there anything else that we want to cover

10:28AM 6   this morning on the issue of objections? The calculation will

10:28AM 7   turn on whatever I determine applies, in terms of (q)1.2 or

10:29AM 8   (q)1.3, I take it?

10:29AM 9       MR. HARRELL: Well, partly, Your Honor. And I guess this

10:29AM 10  really depends on how far the Court wants to go this morning. I

10:29AM 11  think the parties agree -- I'm almost afraid to say that -- but

10:29AM 12  I think the parties agree, Your Honor, that these two

10:29AM 13  guidelines run parallel to each other, and that the big

10:29AM 14  difference -- the substantive difference between the two is the

10:29AM 15  8 versus the 6 starting point.

10:29AM 16      The other issues, Your Honor, in terms of the objections we

10:29AM 17  have interposed, particularly, whether any of the substantive 1

10:29AM 18  through 4 enhancements, two of which the Probation Officer and

10:29AM 19  Government have sought to apply, which we have objected to,

10:29AM 20  they run parallel in both guideline sections, so the arguments

10:29AM 21  are essentially the same.

10:29AM 22      So our argument, Your Honor, succinctly stated, at least,

10:30AM 23  I'll try to be succinct, is that the record-keeping offense to

10:30AM 24  which Mr. Klepadlo has pled guilty to, there is no substantive

10:30AM 25  enhancement that should apply. If you look at both guidelines,

10:30AM 1    Your Honor, it says that if the record-keeping offense, which

10:30AM 2    is very broadly defined in both guidelines as including the

10:30AM 3    submission of false reports, which is what our client has

10:30AM 4    admitted to, if it's a record-keeping offense that was intended

10:30AM 5    to conceal a substantive violation of the permit.

10:30AM 6        For example, if there was a change in the form, a false

10:30AM 7    number written down to hide an exceedance, then, Your Honor,

10:30AM 8    the guideline properly says you should apply the substantive

10:30AM 9    enhancements.

10:30AM 10       In this case, Your Honor, there is no evidence of any

10:31AM 11   intention by my client to conceal any violation here. In fact,

10:31AM 12   as I noted earlier, Mr. Klepadlo admitted to the DEP

10:31AM 13   investigators, who are here and who will testify, and there's a

10:31AM 14   report, Your Honor, that is attached to somebody's memo, either

10:31AM 15   theirs or ours, that says my client, as early as 2013, admitted

10:31AM 16   to the DEP investigators that they did not go to the plant

10:31AM 17   every day, that they went, in his view and his understanding

10:31AM 18   was that they were going, at least, a couple times a week,

10:31AM 19   which meant that they were taking samples a couple times a

10:31AM 20   week, including the weekly composite samples, which we all

10:31AM 21   agree are the most important.

10:31AM 22       That's what my client believed in 2013, it's what he

10:31AM 23   believed in 2015 when he was interviewed by the FBI and the EPA

10:31AM 24   agents that are assigned to this case. It's the reason why he's

10:31AM 25   pled guilty. He has admitted that. He said to them, at the

10:32AM 1  time, that, in his view, daily testing of the pH and the DO

10:32AM 2  were not necessary for the safe treatment of the plant, and

10:32AM 3  that the pH levels would never vary between the ranges that

10:32AM 4  were set in the permit, and, Your Honor, that is, in fact, the

10:32AM 5  case. He also said, Your Honor, that he didn't feel it was

10:32AM 6  necessary to take all the other daily samples at both plants.

10:32AM 7  He admitted to that.

10:32AM 8      What he didn't admit to, Your Honor, and what they are

10:32AM 9  trying to now bring back into the case is that he didn't know

10:32AM 10 that the sewage treatment plant operator, who they will admit

10:32AM 11 was primarily assigned to these two plants, was not going with

10:32AM 12 the frequency that he believed he was.

10:32AM 13     So, in fact, we have this surveillance that shows that Mr.

10:32AM 14 Sheposh, who was the operator, the certified operator for these

10:32AM 15 two plants, was not, in fact, going. But, Your Honor, on the

10:33AM 16 issue of concealment and on the issue of my client's intent,

10:33AM 17 which is what's important here, there was no effort to conceal

10:33AM 18 the fact that they were not going to the plant every day. In

10:33AM 19 fact, the evidence is directly to the opposite.

10:33AM 20     So, Your Honor, in our view, and our argument is that, as a

10:33AM 21 matter of fact and as a matter of law, the substantive

10:33AM 22 enhancements of 1 through 4 of each of those guidelines,

10:33AM 23 whether it's 2(q)1.2 or 2(q)1.3 do not apply, and this is, in

10:33AM 24 fact, a record-keeping offense, and, therefore, the guideline

10:33AM 25 range should not be enhanced by either sub 1 or sub 4, which

10:33AM 1    are the continuous discharge in violation of a permit, and No.

10:33AM 2    4, which is -- I can't remember -- but they both relate to

10:33AM 3    substantive offenses, again, Your Honor, which are not --

10:33AM 4         THE COURT: So you're talking about Paragraphs 25 and 26?

10:34AM 5         MR. SHEPPARD: Yes.

10:34AM 6         THE COURT: Is that right?

10:34AM 7         MR. SHEPPARD: Yes, Your Honor.

10:34AM 8         THE COURT: Got it.

10:34AM 9         MR. SHEPPARD: I'm sorry, Your Honor. Again, the key is,

10:34AM 10   under the guidelines, where it's a record-keeping offense,

10:34AM 11   which is defined in the guidelines, very broadly, clearly

10:34AM 12   captures the offense conduct here, unless there is evidence of

10:34AM 13   an intention to conceal, the substantive enhancements that are

10:34AM 14   sought to be applied by the Government do not apply.

10:34AM 15        THE COURT: All right. Anything you want to say about that?

10:34AM 16        MR. HARRELL: Yes, Your Honor. Whether they sampled two days

10:34AM 17   a week for daily samples or they sampled two days a month, they

10:34AM 18   weren't testing every day, as Mr. Sheppard just acknowledged.

10:34AM 19   Yes, it's true his client admitted to various regulators over a

10:34AM 20   period of years that he didn't think it was necessary to take

10:34AM 21   samples every day, that he knew better than what was in the

10:34AM 22   permit, that he admitted he wasn't taking samples every day,

10:34AM 23   but he continued to lie on the DMR's he sent to the DEP.

10:35AM 24        They put in sample numbers for every day, he admitted, in

10:35AM 25   person, that he had failed to comply with the permits

10:35AM 1  requirement for daily testing --

10:35AM 2      THE COURT: Let me get that straight. So you suggest that he

10:35AM 3  did try to conceal by submitting false samples every day?

10:35AM 4      MR. HARRELL: False results for every month, for days. If

10:35AM 5  you're not concealing, why make up bogus numbers?

10:35AM 6      THE COURT: Well, that's how you encounter the concealment

10:35AM 7  argument?

10:35AM 8      MR. HARRELL: Absolutely.

10:35AM 9      THE COURT: Understood.

10:35AM 10      MR. SHEPPARD: Your Honor, may I just briefly respond? Very

10:35AM 11  briefly. Your Honor, if that's what he did, he didn't do a very

10:35AM 12  good job of concealing, number one.

10:35AM 13      Number two, Your Honor, the evidence in this case, Mr.

10:35AM 14  Sheposh wore a wire, he recorded over 50 conversations. The

10:35AM 15  best evidence of the lack of my client's knowledge is in those

10:36AM 16  intercepts. When he says to Joe Sheposh, I told them we were

10:36AM 17  not there every day, and Joe says, Well, I told them we were.

10:36AM 18  His response is, You did? That's what's on the tape. Your

10:36AM 19  Honor, there was no he effort to conceal what he has admitted

10:36AM 20  to.

10:36AM 21      Your Honor, with regard to the DMR's, again, it's Mr.

10:36AM 22  Klepadlo's name on the door, we get that, he clearly is a

10:36AM 23  responsible officer, and we understand that, too. But with

10:36AM 24  regard to his intent to conceal, Your Honor, Joe Sheposh was

10:36AM 25  the certified operator, he was the one who signed the forms.

22

10:36AM 1  They were submitted by Mr. Klepadlo as the responsible officer.

10:36AM 2  That's why we're pleading guilty here. But there was no effort

10:36AM 3  by my client to conceal anything. That's our argument.

10:36AM 4      MR. HARRELL: Your Honor, if I understand the chronology,

10:37AM 5  Mr. Sheposh would prepare the DMR, would show a daily sample

10:37AM 6  for every day of the month. Mr. Klepadlo has admitted that he

10:37AM 7  knew Mr. Sheposh was not taking daily samples. He wasn't taking

10:37AM 8  daily samples, but he's still signing a report that has numbers

10:37AM 9  for daily samples. That's concealment.

10:37AM 10      As for the number of recorded conversations, I think that's

10:37AM 11 just a difference in somehow counting, because we have a much

10:37AM 12 lower number, but that's not really relevant to the discussion

10:37AM 13 on this particular issue.

10:37AM 14      MR. BERGERE: Your Honor, if I might rise on that issue.

10:37AM 15 The sequence of events is important to understand. Joe Sheposh

10:37AM 16 was the operator. Joe Sheposh would collect samples, and he

10:37AM 17 would take them, physically, to the laboratory. The laboratory

10:37AM 18 would analyze them and put the results on the DMR form at the

10:37AM 19 laboratory, based on the samples that they received.

10:37AM 20      The Government has the sheets from Microbac Lab, where Joe

10:38AM 21 Sheposh dropped them off, he relinquished control of them

10:38AM 22 there. Mr. Klepadlo is sitting in his kitchen and on his

10:38AM 23 computer, the DMR forms show up completed, except for pH. Joe

10:38AM 24 Sheposh would come to his house, would sit down at his table,

10:38AM 25 would sign the certification saying, I swear that everything in

23

10:38AM 1   there is true.

10:38AM 2       As to the Greenfield treatment plant, there was no

10:38AM 3   requirement to record in the DMR the daily pH's, the only thing

10:38AM 4   they recorded was a range. On the Benton-Nicholson forms, there

10:38AM 5   was a daily, because they changed the form, the daily form,

10:38AM 6   when the permit was renewed.

10:38AM 7       The Greenfield Township permits of 2009 hasn't been renewed

10:38AM 8   in a decade, but Mr. Sheposh filled those things in. And as he

10:38AM 9   told the officer, Mr. Sheposh said he recorded those numbers in

10:38AM 10  his iPad or Notepad, that he filled them out. My client didn't

10:38AM 11  know that he was filling out all of those numbers, except as to

10:38AM 12  Benton-Nicholson as to the pH. Those are the days he knew he

10:38AM 13  wasn't showing up, and he recorded it in a range.

10:39AM 14      In his own mind, the pH didn't vary, because it's ground

10:39AM 15  water, it's not going to vary anywhere near the permit limits.

10:39AM 16  In his own mind, that was the risk that he accepted, but all

10:39AM 17  the other falsifications, Mr. Sheposh was showing up with

10:39AM 18  samples, the issues we all have is where he was getting them

10:39AM 19  from, we don't know, but he is responsible for that conduct,

10:39AM 20  and that's not what we're pleading to.

10:39AM 21      THE COURT: All right.

10:39AM 22      MR. HARRELL: Your Honor, I don't have anything to add.

10:39AM 23      THE COURT: Okay. Anybody want to say anything else? I'll

10:39AM 24  give you the last word.

10:39AM 25      MR. SHEPPARD: He rises with some trepidation. Your Honor, I

10:39AM 1  know the Court has other things on the schedule here, but there

10:39AM 2  are, as Mr. Harrell pointed out, two guided departures, that if

10:39AM 3  the Court were to apply these substantive enhancements under 1

10:39AM 4  and 4 of the guideline range, it's our argument, in the

10:40AM 5  alternative, that there should be a two-level decrease, as set

10:40AM 6  forth in those guidelines, themselves, because of a lack of

10:40AM 7  environmental harm here and the seriousness or the lack of

10:40AM 8  seriousness of our client's conduct or, at least, his

10:40AM 9  intentions.

10:40AM 10       THE COURT: Well, I understand that. I'm not going to

10:40AM 11  determine that. I'll give you an opportunity to argue that when

10:40AM 12  we have sentencing.

10:40AM 13       MR. SHEPPARD: And in terms of the guidelines, Your Honor,

10:40AM 14  those were the objections --

10:40AM 15       THE COURT: All right.

10:40AM 16       MR. SHEPPARD: -- that we had interposed. So those were the

10:40AM 17  guideline objections.

10:40AM 18       THE COURT: All right. I will take this under advisement,

10:40AM 19  and we will reschedule -- we will schedule another date for

10:40AM 20  sentencing. In the meanwhile, I'll determine the issues here

10:40AM 21  and issue an opinion in short order.

10:41AM 22       MR. SHEPPARD: Thank you, Your Honor.

10:41AM 23       MR. HARRELL: Thank you.

10:41AM 24       THE COURT: Sorry for the inconvenience, but there were so

10:41AM 25  many documents filed here that I thought this was the best way

10:41AM  1   to handle this. I know everybody has traveled here, and I know

10:41AM  2   it's expensive, and I apologize for that, but I think, in order

10:41AM  3   to give it the proper care and treatment that it deserves, this

10:41AM  4   is the best way to proceed.

10:41AM  5       MR. SHEPPARD: We understand that, Your Honor. And if I may,

10:41AM  6   sir, just one other point. With regard to the Board resolution

10:41AM  7   that was received this morning, Your Honor, this is the first

10:41AM  8   that we have heard there is an issue of restitution here,

10:41AM  9   though, we have been told that one may be coming.

10:41AM  10      Your Honor, we would like the opportunity to try to address

10:41AM  11  in the interim, if we may. I think our argument is going to be

10:41AM  12  very similar, in that, there is no restitution that should flow

10:41AM  13  from the count of conviction, which, again, under the mandatory

10:41AM  14  witnesses act --

10:42AM  15      THE COURT: I looked at this this morning. I don't see

10:42AM  16  any -- I see a lot of whereas clauses, I see no, be it

10:42AM  17  resolved. So I don't know what this means, so I'll give you an

10:42AM  18  opportunity to -- I'll give both sides an opportunity to

10:42AM  19  determine what to do with it. I don't know what to do with it

10:42AM  20  at the moment.

10:42AM  21      MR. SHEPPARD: Thank you, Your Honor.

10:42AM  22      THE COURT: All right, thank you. Thank you all.

23      (At this time the proceedings were adjourned.)

24

25

26

1                     C E R T I F I C A T E

2

3          I, KRISTIN L. YEAGER, Official Court Reporter for the

4     United States District Court for the Middle District of

5     Pennsylvania, appointed pursuant to the provisions of

6     Title 28, United States Code, Section 753, do hereby certify

7     that the foregoing is a true and correct transcript of the

8     within-mentioned proceedings had in the above-mentioned and

9     numbered cause on the date or dates hereinbefore set forth; and

10    I do further certify that the foregoing transcript has

11    been prepared by me or under my supervision.

12

13                         S/Kristin L. Yeager
                           KRISTIN L. YEAGER, RMR,CRR
14                         Official Court Reporter

15

      REPORTED BY:
16
          KRISTIN L. YEAGER, RMR,CRR
17        Official Court Reporter
          United States District Court
18        Middle District of Pennsylvania
          P.O. Box 5
19        Scranton, Pennsylvania  18501

20

21

22          (The foregoing certificate of this transcript
      does not apply to any reproduction of the same by any means
23    unless under the direct control and/or supervision of the
      certifying reporter.)

24

25