**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Docket No. 3:16-cr-254** |
| | : | |
| **DAVID KLEPADLO, and** | : | |
| **DAVID D. KLEPADLO &** | : | |
| **ASSOCIATES, INC.** | : | |

## SUPPLEMENT TO DEFENDANTS' SENTENCING MEMORANDUM

David Klepadlo and David D. Klepadlo & Associates, Inc. ("DDK"), by and through their counsel hereby respectfully submit this Supplement to Defendants' Sentencing Memorandum filed on September 27, 2019 (hereinafter "Sentencing Memorandum") to provide the Court with updated arguments on outstanding guideline calculation objections, an updated guideline calculation, updated financial and medical information, and an additional downward variance argument related to the COVID-19 pandemic.

On September 1, 2020, David Klepadlo will appear before the Court individually and on behalf of DDK to be sentenced on one count of making a false statement in violation of the Clean Water Act under 33 U.S.C. § 1319(c)(4) and one count of witness tampering under 18 U.S.C. § 1512(c)(2).

Prior to the COVID-19 pandemic, a term of imprisonment was not the least restrictive sentence available to sufficiently serve the goals of sentencing. The comparative sentencing analysis in Defendants' Sentencing

1

Memorandum demonstrates that imprisonment is rarely warranted for a false statement offense in violation of 18 U.S.C. §1319(c)(4), particularly where the offense did not result in environmental harm to the adjacent stream. The Sentencing Memorandum provides twenty-three examples in which courts imposed non-custodial sentences on similarly situated defendants who were convicted of making false statements under 18 U.S.C. 1319(c)(4) in connection with wastewater treatment and manufacturing plants. *See* Defs. Sentencing Memo, pp. 25-28. Mr. Klepadlo respectfully submits that prison sentences are typically reserved for defendants who were convicted of substantive environmental offenses that resulted in actual environmental harm. *See id.*

In addition to the mitigating evidence that supports a downward variance as set forth in Mr. Klepadlo's Sentencing Memorandum, the unique circumstances posed by the COVID-19 pandemic and Mr. Klepadlo's ███ ████████████ further necessitate a non-custodial sentence. ███████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████

As of August 27, 109 BOP facilities have active COVID-19 infections, including several facilities in Pennsylvania and neighboring states where Mr. Klepadlo could be designated.  Most concerningly, every Federal Medical Center for male offenders and their adjacent Care Level 3 facilities have *active* infections and high rates of mortality among inmates who contract the virus.  Because of Mr. Klepadlo's ███████████, he could also be designated to one of these facilities.

 A term of imprisonment would pose an unnecessary risk to Mr. Klepadlo's health and safety without furthering, in any meaningful way, the goals of sentencing under 18 U.S.C. § 3553.  Such a punishment would be excessively punitive in comparison to his offense conduct, the lack of environmental harm that resulted therefrom, his remorse, and his long history of law-abiding conduct—both before the offense and in the five years since he was charged.

Conversely, imposition of a non-custodial sentence upon Mr. Klepadlo—who poses no threat to the community and because he voluntarily surrendered his sewage treatment plant operator's license cannot and will not recidivate—is not only wholly consonant with the goals set forth under 18 U.S.C. § 3553, but is also consistent with the letter and spirit of Attorney

General Barr's recent memoranda addressing the public health crisis that the pandemic inflicts on BOP facilities, inmates, and staff.

For all of the reasons set forth in his Sentencing Memorandum and those set forth herein, Mr. Klepadlo submits that a substantial downward variance from the advisory guideline range is warranted and that a non-custodial sentence will sufficiently serve the goals of sentencing.

## I.   Defendants' Outstanding Objections to the Guideline Calculation in the Presentence Report.

The Defendants appeared before the late Judge A. Richard Caputo on September 30, 2019 for a hearing on their guideline objections.  Following the hearing, the Court issued a Memorandum Opinion on October 9, 2019 and held that USSG § 2Q1.2 is the applicable guideline to Defendants' Clean Water Act violation.  Though the Defendants respectfully disagree with Judge Caputo's interim ruling, they accept that it is the law of the case and that for purposes of this hearing, USSG § 2Q1.2 is the applicable guideline and 8 is the base offense level.

The only outstanding dispute with respect to the advisory guidelines range is the application of the specific offense enhancements under § 2Q1.2(b)(1)(A) and § 2Q1.2(b)(4).  Because the substantive environmental offense articulated by Judge Caputo under § 2Q1.2(b)(5) was Defendants' failure to collect and analyze samples at the required frequencies under the permit, an enhancement under § 2Q1.2(b)(1)(A) is not appropriate in this case for the reasons described below.

4

However, should the Court find that the government has met its burden and the enhancement under § 2Q1.2(b)(1)(A) applies, Mr. Klepadlo respectfully submits that a two-level reduction to such an enhancement is appropriate under Application Note 5.  With respect to the enhancement under § 2Q1.2(b)(4), Mr. Klepadlo withdraws his objection to its application with the caveat that a two-level reduction under Application Note 8 is appropriate as described below.

### A.   A six-level enhancement under USSG § 2Q1.2(b)(1)(A) is not warranted.

#### 1.   An enhancement under (b)(1)(A) is not appropriate in this case.

A six-level specific offense enhancement under USSG § 2Q1.2(b)(1)(A) applies when an offense "resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a hazardous or toxic substance or pesticide into the environment."  This enhancement is most often applied in cases where the defendant is convicted of *illegally* discharging pollutants under 33 U.S.C. 1319(c)(2) and similar substantive environmental violations involving the illegal release of pollutants into the environment in an ongoing and repetitive manner. *See, e.g.*, *United States v. West Indies Transport, Inc.*, 127 F.3d 299 (3d Cir. 1997) (*raw untreated sewage repeatedly* discharged directly into the bay in violation of 1319(c)(2)(A)).

Sewage treatment plants are designed to *legally* discharge pollutants on an ongoing and repetitive manner in permitted amounts.  The government has conceded that it has no proof that Defendants *illegally* discharged pollutants as a result of the criminal conduct.  *See* Tr. Objections Hearing, p. 11 (Sept. 30, 2019) (*"I would say it's impossible to know if things were being discharged illegally."*). Thus, every treatment plant in the country would, if the government is correct, be subject to this enhancement, no matter what the count of conviction is.

That Mr. Klepadlo pled guilty to a false statement offense under 33 U.S.C. § 1319(c)(4), and not to a substantive environmental offense, highlights this anomalous result.  As Judge Caputo found, Defendants' conduct reflected an "effort to conceal" instances when the actual testing was not done.  Defendants' offense was not an attempt to conceal *illegal* or excessive discharges.  While Defendants concede that there were instances of ammonia exceedances (the hazardous substance underlying the application of § 2Q1.2), Defendants *reported* those exceedances in the test results submitted to the DEP and the government has not proffered any evidence that these exceedances were *caused by* Defendants' recordkeeping offense or failure to collect samples at the specified frequencies as required under the permits.

Without some showing that a pollutant was released because of Mr. Klepadlo's violations, this enhancement is not appropriate.  *Cf. United States v.*

*Chau*, 293 F.3d 96, 100 (3d Cir. 2002) (asbestos released as a result of defendant's illegal removal of asbestos in violation of the Clean Air Act); *United States v. Smith*, 629 Fed. App'x 292 (3d Cir. 2015) (same).  Based on the foregoing, the government has not demonstrated by a preponderance of the evidence that an enhancement under 2Q1.2(b)(1)(A) applies.

> **2.    Alternatively, a two-level reduction is appropriate if the Court finds that an enhancement applies under USSG § 2Q1.2(b)(1)(A).**

In recognition that § 2Q1.2(b)(1)(A) encompasses a "wide range" of conduct and varying propensities, the Guideline instructs courts to consider reducing the six-level enhancement by two levels depending on the harm resulting from the contamination, the nature of the pollutant, the duration of the conduct, and the risk associated with the violation.  *See* USSG § 2Q1.2 n.5.

For example, a six-level enhancement may be appropriate in cases where the defendant knowingly dumped untreated sewage into a body of water, causing harm to the environment.  *See, e.g.*, *United States v. Mcclain*, 2:06-cr-00102-MMB-1 (E.D. Pa., filed Mar. 3, 2006) (wastewater treatment plant superintendent dumped thousands of gallons of raw sewage and sludge that led to a river); *United States v. Van Dyke*, 3:03-cr-00033-1 (N.D. Ind., filed March 12, 2003) (wastewater treatment plant operator released untreated sewage into a creek and killed

thousands of fish); *United States v. Goldman*, 3:02-cr-00563-2 (D. South Carolina, filed May 22, 2002) (executive illegally discharged wastewater, killing nearly 1,000 fish).

On the other hand, a two-level reduction is appropriate in cases where illegal discharges did not result in any environmental harm. *See, e.g.*, *United States v. Spain*, 591 F. Supp. 2d 970 (N.D. Ill. 2008) (departing downward two levels where defendant was convicted of discharging industrial wastewater with abnormally high or low pH levels but no environmental harm despite risk of harm).

Between 2013 and 2015, the PADEP collected and analyzed effluent samples at GTSA and BNSA on several occasions. The effluent samples collected and analyzed by the PADEP (which were analyzed by Defendants' expert, Kevin Long) did not contain levels of pH or Ammonia that would pose a significant risk to human health or aquatic life in the stream. *See* Exhibit D. Notably, the government did not collect any samples from the adjacent receiving streams or conduct any environmental evaluation during the nearly five-year period while this case was being investigated or in the past four years since the indictment was issued. As set forth in Defendants' Sentencing Memorandum (Sections IV.C.1 & V.A) and Kevin Long's expert report attached thereto as "Exhibit D", there is no evidence that Defendants' conduct resulted in environmental harm to the stream.

Defendants concede that inattentive oversight of the plant's operations *could have* resulted in harm.  While the agencies were justifiably concerned over the failure of the DDK & Associates[1] to diligently attend to the sampling at these plants, there was never any serious concern that the company's failure to do so was causing actual harm to the waterways.  Indeed – there is simply no other inference to be drawn from the decision by the agencies to forgo an analysis of the stream.  The stream's health was unaffected by Mr. Klepadlo's conduct, and the government has not proffered evidence to prove otherwise.  The absence of environmental harm is a mitigating circumstance that warrants a two-level reduction to the enhancement under (b)(1)(A), and further supports a non-custodial sentence.

**B.** **Reducing the four-level specific offense enhancement under USSG § 2Q1.2(4) by two levels is warranted under Note 8.**

A four-level specific offense enhancement under USSG § 2Q1.2(b)(4) applies when the offense involves "a violation of a permit, or where there was a failure to obtain a permit when one was required."  USSG § 2Q1.2 n.8.  Like the enhancement under § 2Q1.2(b)(1)(A), an enhancement under § 2Q1.2(b)(4) covers

---

[1] While the evidence is uncontradicted that it was a DDK & Associates' employee (and licensed treatment operator in his own right) who was responsible for conducting the sampling, Mr. Klepadlo has repeated stated that as the owner of the firm and as his employer, he is ultimately responsible for causing the test results to be submitted.

a wide variety of conduct.  Accordingly, Application Note 8 permits courts to apply a two-level reduction "[d]epending upon the nature and quantity of the substance involved and the risk associated with the offense."  *See id.*

For the reasons set forth herein and in Defendants' Sentencing Memorandum in Section IV.C.2, a two-level reduction is warranted because the quantity of the pollutants and risk involved in Defendants' conduct were small.  *Cf. United States v. Kuhn*, 345 F.3d 431, 439-440 (6th Cir. 2003) (granting two-level reduction because "the environmental harm did not seem to be very great"); *United States v. Bogas*, 731 F. Supp. 242, 250 (N.D. Ohio 1990) (two-level reduction where "the quantity and the risk involved were so small").

## II.   Updated Guidelines Calculation

The adjusted offense level for the Clean Water Act violation is 14 and is calculated as follows:

Base Offense Level under § 2Q1.2:     8
USSG § 2Q1.2(b)(4) enhancement:     +2 (4 minus 2 levels under Note 8)
USSG § 3B1.1(c) Adjustment:     +2
USSG § 3B1.3 Adjustment:     +2

**Adjusted Offense Level =     14**[2]

---

[2] If the Court finds that an enhancement under USSG § 2Q1.2(b)(1) applies, the adjusted offense level is 18 (six levels minus a two-level reduction under Note 5).

Mr. Klepadlo also pled guilty to witness tampering in violation of 18 U.S.C. § 1512(c)(2), which carries a base offense level of 14. However, where, as here, a defendant is convicted of an obstruction offense that is related to the an underlying offense, two levels are added to the underlying offense, and the group offense level is determined by applying either the offense level for the underlying offense or for the obstruction offense, whichever is greater. *See* USSG § 3C1.1 n.8.

Here, both offense levels are 14. The adjusted offense level for the Clean Water Act violation becomes 16 after adding two levels for obstruction under USSG § 3C1.1 n.8. Accordingly, 16 is the group offense level. The total offense level should be calculated as follows:

| | |
|---|---|
| Group Offense Level | 16 |
| Acceptance of Responsibility    under USSG 3E1.1(a) | -2 |
| Acceptance of Responsibility under USSG 3E1.1(b) | -1 |
| **Total Offense Level:** | **13** |

With a Criminal History Category I, Mr. Klepadlo's Guideline range is 12-18 months of imprisonment, or a combination of imprisonment and home detention. *See* USSG § 5C1.1(d).

### III.   Klepadlo's Vulnerability to COVID-19 Renders a Custodial Sentence a Far Greater Punishment Than Necessary to Serve the Goals of Sentencing.

In addition to the mitigating circumstances that support a downward variance as set forth in Mr. Klepadlo's Sentencing Memorandum, the COVID-19

pandemic coupled with Mr. Klepadlo's ███████████████████ further

necessitate a noncustodial sentence under 18 U.S.C. § 3553(a).

**A.   <u>Mr. Klepadlo is particularly vulnerable to COVID-19</u>**



Under the CDC Guidelines, Mr. Klepadlo is considered an at-risk individual

who should avoid unnecessary interactions with other people and must take extra

precautions when interacting with others.[3] ████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████ The CDC has specifically designated ██████████

---

[3] *People with Certain Medical Conditions*, CDC (updated Aug. 14, 2020),
*available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
precautions/people-with-medical-
conditions.html#:~:text=People%20of%20any%20age%20with%20the%20follo
wing%20conditions%20are%20at,COPD%20(chronic%20obstructive%20pulmo
nary%20disease)

███████████████████████████████████████████, as underlying conditions that place people of *any age* at an increased risk of severe illness or death from COVID-19.[4]  As a 65-year-old, Mr. Klepadlo's risk of serious illness or death is further compounded.[5]

At a minimum, contracting COVID-19 is likely to lead to deteriorated health for Mr. Klepadlo. ██████████████████████████



_____

[4] *Id.*; *see also Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19*, CDC (updated July 28, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html; *Other Conditions Related to Heart Disease*, CDC, *available at* https://www.cdc.gov/heartdisease/other_conditions.htm

[5] 80% of COVID-19 deaths have been of patients who are 65 year of age and older. *See Older Adults*, CDC (Aug. 16, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html

[6] Jolanda Sabatino et al., *Impact of cardiovascular risk profile on COVID-19 outcome*, Plos One Journal (Aug. 14, 2020), *available at* https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0237131.

[7] Dr. Haider Warraich, *Covid-19 is Creating a Wave of Heart Disease*, N.Y. Times (Aug. 17, 2020), *available at* https://www.nytimes.com/2020/08/17/opinion/covid-19-heart-disease.html

[8] *See Guidance on Short-Term Management of Atrial Fibrillation in Coronavirus Disease 2019*, Journal of the American Heart Association (June 9, 2020), *available at* https://www.ahajournals.org/doi/10.1161/JAHA.120.017529

**B.**     **Mr. Klepadlo faces a high likelihood of contracting**
**COVID-19 if a custodial sentence is imposed.**

As of August 27, 2020, 109 BOP facilities have active confirmed positive

cases of COVID-19 among inmates and staff,[9]  including several facilities with

minimum securities camps in Pennsylvania and surrounding states where Mr.

Klepadlo could be assigned.  Statistics at these facilities are illustrated in the table

below.

| Facility | Current confirmed infections | Pending COVID tests | Previously infected inmates & staff | Inmate and staff deaths |
|---|---|---|---|---|
| USP Lewisburg | 32 | 1 | 62 | N/A |
| FCI Loretto | 9 | N/A | 59 | N/A |
| FCI Fairton | 5 | N/A | 107 | N/A |
| FCC Hazelton | 2 | N/A | 12 | N/A |
| FCC Allentown | 4 | 4 | 4 | N/A |
| FCI Elkton | 5 | N/A | 1,025 | 9 inmates |
| FCC Petersburg | 99 | 10 | 3 | N/A |
| FCI Cumberland | 2 | 32 | 12 | N/A |

If Mr. Klepadlo is sentenced to a term of imprisonment, the BOP may

designate him to a Federal Medical Center or one of the adjacent Care Level 3

facilities as a result of █████████████████████████████

---

[9] *See COVID-19 Cases*, Federal Bureau of Prisons, *available at*
https://www.bop.gov/coronavirus/#:~:text=COVID%2D19%20Cases&text=The
re%20are%201%2C407%20federal%20inmates,attributed%20to%20COVID%2
D19%20disease. (last visited Aug. 27, 2020).

████████████████████████████████████   As of August

27, <u>every</u> Federal Medical Center for male offenders and their adjacent facilities

have active positive cases of COVID-19, and several inmates have died at these

facilities.  These statistics are illustrated below.

| Facility | Current confirmed infections | Pending COVID tests | Previously infected inmates & staff | Death |
|----------|------------------------------|---------------------|-------------------------------------|-------|
| FCC Butner | 9 | 5 | 924 | 25 inmates and 1 staff |
| FMC Devens | 3 | N/A | 54 | 2 inmates |
| FMC Lexington | 2 | N/A | 225 | 8 inmates |
| FMC Rochester | 8 | 7 | 2 | N/A |
| FMC Fort Worth | 15 | 41 | 582 | 12 inmates |

Despite the BOP's diligent efforts in protecting inmates, the COVID-19

pandemic poses unique challenges for BOP facilities with respect to detecting

positive cases and controlling the rate of transmission.[10]  The inherent conditions in

prisons—e.g., close quarters, shared bathrooms, frequent introduction of new

inmates, and daily entry and exit of staff—render the extra precautions that at-risk

---

[10] *Serial Laboratory Testing for SARS-CoV-2 Infection Among Incarcerated and Detained Persons in a Correctional and Detention Facility*, CDC (July 3, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6926e2.htm?s_cid=mm6926e2_w.

individuals like Mr. Klepadlo should take nearly impossible to follow.[11]   In a

Memorandum to the BOP, Attorney General Barr acknowledged that at-risk

inmates like Mr. Klepadlo would be *"safer serving their sentences in home*

*confinement rather than in BOP facilities." See* AG Barr Memo (3/6/20).  Indeed,

COVID-19 infections and death rates in BOP facilities are significantly higher than

those of the general population in the United States, as demonstrated by the first

graph below.[12]



---

[11] *COVID-19 in Correctional and Detention Facilities – United States, February-April 2020*, CDC Morbidity and Mortality Weekly Report, *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6919e1-H.pdf.

[12] This chart is a compilation of the BOP's statistics and is updated daily by the Federal Defenders of New York.  *See BOP-Reported Positive Tests for COVID-19 Nationwide, available at* https://federaldefendersny.org/ (last visited Aug. 27, 2020).

The full scope of transmission in federal prisons is not known because the BOP's statistics are suspected to be significantly underestimated for various reasons.[13]  Despite the underestimated statistics, reported positive infections and deaths in BOP facilities have still increased in recent weeks.  As of August 27, 2020, the BOP reports that at least 11,904 inmates and 1,544 staff from its facilities have contracted COVID-19, and 116 inmates and 1 BOP staff member have died from the disease.[14]  The graph below demonstrates the recent rise in COVID-19 infections and deaths in federal facilities based on BOP statistics.[15]



---

[13] *See, e.g.*, *United States v. Rodriguez*, 2020 WL 1627331, at *9 (E.D. Pa. Apr. 1, 2020) ("The BOP's reported cases are rapidly growing and almost certainly underestimate the true number of infections.").

[14] *See* Fed. Bureau of Prisons, *BOP: COVID-19 Update*, *available at* https://www.bop.gov/coronavirus/index.jsp

[15] *See supra* n.11.

### C. Mr. Klepadlo's vulnerability to COVID-19 supports a non-custodial sentence.

In the context of compassionate release petitions and pre-trial detention hearings, the Department of Justice has recognized the "particularly acute" risk that custodial sentences pose on individuals who are vulnerable to serious illness under the CDC Guidelines.  In memoranda dated March 26 and April 3, Attorney General Barr instructed the Bureau of Prisons to transfer at-risk, non-violent inmates who are unlikely to recidivate to home confinement.  *See* AG Memos, 3.26.20 & 4.3.20.  In April, AG Barr also implored all United States Attorney's Offices to consider not seeking detention for defendants who are vulnerable to COVID-19 under the CDC Guidelines, relative to the seriousness of the offense and the defendant's flight risk.  *See* AG Barr Memo, 4.6.20.

Since AG Barr issued his Memorandum to the BOP in March, the BOP has transferred over 7,500 inmates like Mr. Klepadlo to home confinement,[16] and federal district courts throughout the country have granted compassionate release motions filed by inmates with relatively benign conditions, such as hypertension, because of the risks posed by the pandemic. *See, e.g.*, *United States v. Burke*, 2020 WL 3000330 (D. Ne. June 4, 2020).  The government has even started conceding

---

[16] *See supra* n.14.

that obesity is an "extraordinary and compelling reason" that justifies an inmate's release during the pandemic.  *See, e.g.*, Exhibit L.

Mr. Klepadlo exemplifies the type of individual who should not be detained in a BOP facility under the Attorney General's recent guidance.  ███████████ ███████████████████████████  Mr. Klepadlo is particularly vulnerable to serious illness or death if he contracts COVID-19.

For the reasons set forth herein and in Defendants' Sentencing Memorandum, Mr. Klepadlo's vulnerability to COVID-19 renders a prison sentence excessively punitive in comparison to his offense conduct and the lack of environmental harm that resulted therefrom.  Such a punishment would be inconsistent with the mandate to impose a sentence that is not greater than necessary to serve the goals of sentencing.

> **D.**   **The COVID-19 pandemic poses additional collateral consequences that further support a non-custodial sentence under  18 U.S.C. § 3553**

Beginning in March in response to the pandemic, the BOP suspended inmate visits with family and in-person programming.[17]  Under these modified operations, inmates are rarely permitted to leave their cells.  BOP facilities are also using

---

[17] *BOP Implementing Modified Operations*, Federal Bureau of Prisons, *available at* https://www.bop.gov/coronavirus/covid19_status.jsp

solitary confinement and transferring minimum security inmates to high security

facilities as mechanisms to control the spread of the virus.[18]

These conditions are particularly punitive for Mr. Klepadlo ████



These additional circumstances further support a non-

custodial sentence.

### IV.  Updated Financial Information and the Imposition of a Fine

---

[18] *Bureau of Prisons Using Solitary Confinement as a Means to Curb Covid-19 Contagion*, Forbes (July 16, 2020), *available at* https://www.forbes.com/sites/walterpavlo/2020/07/16/bureau-of-prisons-using-solitary-confinement-as-a-means-to-curb-covid-19-contagion/#1ea80d22193a; *see also Otisville Federal Prison Camp is More Like a Higher Security Prison in Fight Against Covid-19*, Forbes (June 28, 2020), *available at* https://www.forbes.com/sites/walterpavlo/2020/06/28/otisville-federal-prison-camp-is-more-like-a-higher-security-prison-in-fight-against-covid-19/#62d6a7bbe48a

[19] *Physically Distanced but Digitally Connected*, Alcoholics Anonymous (May 11, 2020) *available at* https://www.aa.org/press-releases/en_US/no_page/physically-distanced-but-digitally-connected-the-alcoholics-anonymous-message-carries-on-amid-coronavirus-covid-19

████████████████████████████████████████

██████████████████████████

Accordingly, Defendants respectfully request the Court to waive imposition of a fine, and instead impose a non-custodial sentence and a period of supervised release with any special conditions the Court deems appropriate.

## V.   <u>CONCLUSION</u>

For all the reasons set forth in Defendants' Sentencing Memorandum and herein, Mr. Klepadlo respectfully requests that the Court impose a non-custodial sentence.

Respectfully submitted,

<u>/s/ Timothy J. Bergere</u>

Timothy J. Bergere
Armstrong Teasdale LLP
2005 Market Street, 29th Floor, One
Commerce Square, Philadelphia, PA
19103
(267) 780-2024
tbergere@atllp.com
*Counsel for Defendants*

<u>/s/ Mark Sheppard</u>

Mark Sheppard, Esquire
Meredith A. Lowry, Esquire
Klehr, Harrison, Harvey, Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
(215) 569-2198
msheppard@klehr.com
*Counsel for Defendants*

Date: August 28, 2020

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that, on the date provided below, I caused a true and correct copy of

David Klepadlo's Sentencing Memorandum to be filed electronically via the ECF

system. The same was sent via electronic mail to the following:

Michelle Olshefski, AUSA
United States Attorney's Office
Middle District of Pennsylvania
United States Attorney's Office
P.O. Box 309
Scranton, PA 18501

Warren M. Harrell
United States Environmental Protection Agency
1650 Arch St.
Philadelphia, PA 19103

Stephen P. Zdaniewicz
U.S. Probation Officer
235 N. Washington Ave
Scranton, PA 18501

*/s/ Meredith Lowry*
Meredith Lowry
Counsel for Defendants

Date: August 28, 2020