IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA :
                         :
                         :
                         :
    vs                   :    3:16-CR-254
                         :
                         :
                         :
DAVID D. KLEPADLO, ET AL :
                         :
                         :

    BEFORE:        THE HONORABLE MALACHY E. MANNION

    PLACE:         COURTROOM NO. 4

    PROCEEDINGS:   SENTENCING

    DATE:          WEDNESDAY, OCTOBER 28, 2020

APPEARANCES:

For the United States:
MICHELLE OLSHEFSKI, ESQ.
U.S. ATTORNEY'S OFFICE
P.O. BOX 309
235 NORTH WASHINGTON AVENUE
SCRANTON, PA 18501

WARREN M. HARRELL, ESQ.
U.S. ENVIRONMENTAL PROTECTION AGENCY
1650 ARCH ST.
PHILADELPHIA, PA 19103

For the Defendant:
MEREDITH A. LOWRY, ESQ.
KLEHR HARRISON HARVEY BRANZBURG LLP
1835 MARKET STREET
SUITE 1400
PHILADELPHIA, PA 19103

TIMOTHY J. BERGERE, ESQ.
ARMSTRONG TEASDALE LLP
2005 MARKET STREET
29TH FLOOR
ONE COMMERCE SQUARE
PHILADELPHIA, PA 19103

1          THE COURT:  Good morning.  All right.  This is the

2    matter of the United States of America against David Klepadlo

3    and David Klepadlo Associates.  The criminal numbers are

4    3:CR-16-254-01 and 02.  Today is the date for sentencing in

5    this case.  Now, before we get into that, Mr. Klepadlo, are you

6    under the influence of any drugs, alcohol, intoxicants or

7    medications that would make you unable to understand the

8    proceedings here today?

9          THE DEFENDANT:  No, sir.

10          THE COURT:  All right.  There's been a presentence

11    report prepared in the case.  There's been a number of

12    addendums to the presentence report.  There have been

13    sentencing memorandums filed by both the government counsel and

14    defense counsel.  Have you had an opportunity to review those

15    documents prior to today?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  All right.  Has counsel had sufficient

18    time to discuss the presentence report and the sentencing

19    memorandums and addendums to the presentence report with your

20    client?

21          MS. LOWRY:  Yes, Your Honor.

22          THE COURT:  Has the government had sufficient time to

23    do that?

24          MS. OLSHEFSKI:  Yes, Your Honor.

25          THE COURT:  All right.  Now, it's my understanding

there are still some outstanding objections to the contents of
the presentence report.  So we are going to handle that first,
and then we will move on after that.  So, counsel, they are
your objections, so we will start with you.

MS. LOWRY:  Your Honor, may I stand or --

THE COURT:  You can stand or sit, whatever makes you
comfortable.

MS. LOWRY:  I will remain seated.  Our remaining
objections are with respect to the enhancement under 2 B. 1.2
B. 1 A.  That enhancement -- so under these circumstances, Mr.
Klepadlo pled guilty to a false statement conviction under the
Clean Water Act, and under the guideline the only time when
enhancements under 2 B. 1.2 B. 1 through 4 come in is if the
record keeping event, which is the false statement offense,
reflected an effort to conceal a substantive environmental
offense.  Judge Caputo a year ago found that his -- my client's
offense did -- an effort to conceal a substantive offense.  But
it's important to note what that substantive offense was that
Judge Caputo articulated.  The substance offense was his
failure to manage the plant, a failure to go and take samples
and take P. H. testing.  So that said, that's kind of our
baseline.

That's the substantive offense we're talking about.
We're not talking about discharges that he was -- you know, for
example, sometimes the defendant might submit a false D. M. R.

1  because they wanted to conceal discharges that exceeded the

2  permitted pollutants.  That's not the case here.  So with that

3  said, that's why we're still objecting to B. 1 A. because we

4  think that that enhancement only really applies when we're

5  dealing with a knowing offense where actual pollutants are

6  going into the environment.  Here B. 4 we are not objecting to

7  that because that -- that enhancement applies when there is a

8  violation of a permit.  That clearly applies here.  But with

9  respect to B. 4, we are asking for a two-level reduction under

10 the application notes.

11          THE COURT:  Note eight.

12          MS. LOWRY:  And in addition, if Your Honor does apply

13 the six-point enhancement under B. 1 A., we would also be

14 asking for a two-level reduction.

15          THE COURT:  Okay.  All right.  Counsel?

16          MR. HARRELL:  Your Honor, may I?

17          THE COURT:  We're socially distanced, so you can.

18          MR. HARRELL:  Thank you, Your Honor.  My name is

19 Martin Harrell.  I'm a special assistant United States

20 attorney.  I'm a lawyer with the Environmental Protection

21 Agency Regional Office in Philadelphia.  So I don't know -- do

22 you want us to address just 2 Q. 1.2 B.1's applicability or

23 also get into the guided departure issue at this time?

24          THE COURT:  Well, you can do both.  I have read

25 through your sentencing memorandum that covers your arguments

1  on both of those topics, but you're welcome to address them as

2  you see fit in light of counsel's addressing her aspect of it

3  or her position on it.

4        MR. HARRELL:  Thank you, Your Honor.  So with regards

5  to whether 2 Q. 1.2 B. 1 applies at all, our first argument as

6  we set forth is that Judge Caputo already decided that more

7  than a year ago, and I won't belabor those arguments here.

8  With regards to the false D. M. R.s, the false D. M. R.s cover

9  up the fact there was lack of sampling.  There was lack of

10 anyone coming to the plant to do any operation and maintenance

11 for almost -- for most of a six-month period.  False D. M. R.s

12 were continually submitted month after month, year after year.

13       The permit makes it clear on its face that it is

14 illegal to discharge permits unless -- or pollutants unless you

15 do so in compliance with the permit.  So every day where a

16 discharge occurred or there was wasn't sampling was an illegal

17 discharge of a pollutant into the water in the United States.

18 In addition, Judge Caputo's order made it clear that he

19 considered the relevant conduct charged in the two-year

20 conspiracy count in count one as well as the substantive

21 failure to operate and maintain the plants in counts two and

22 three, that failure to operate and maintain as demonstrated by

23 the numerous photographs that were attached to the government's

24 original sentencing memo make clear that there were discharges

25 into the environment that led to the growth of sewage fungus,

1  bloodworms that thrive in polluted water outside the confines

2  of the plant and into the environment.

3        And for those reasons we believe that 2 Q. 1.2 B. 1

4  does apply and there should be a six-level enhancement.  As for

5  the guided departures, the government discussed in pretty

6  detailed fashion in its supplemental sentencing memo why the

7  Court should not grant those.  The two departures are

8  different.  There are four factors under the 2 Q. 1.2 B. 1

9  analysis having to do with actual harm, having to do with the

10  quantity and nature and duration of the pollutants, the type of

11  pollutant and the risk that was involved.  The defendant in its

12  supplemental sentencing memo characterized the discharges at

13  small, and we went back, and we looked at the actual number of

14  -- amount of -- average amount of volume that was generated on

15  a specific day.

16        THE COURT:  Six million gallons from Greenfield

17  Township and Benton Township two million gallons roughly.

18        MR. HARRELL:  Correct, Your Honor.  That's not small.

19  These are small streams.  We are not talking about the

20  Susquehanna here.  So that amount of sewage just in terms of

21  the quantity factor, which is applicable to both guided

22  departures, it's not a small amount that was being discharged

23  without anyone coming to the plant day after day and barely at

24  all for a six-month period.

25        Then you take into account the discharges that were

1 happening due to the failure to operate and maintain the plant

2 generally.  Again, the growth and pollution that was occurring

3 in the receiving streams, and so the risk that was posed -- you

4 have to keep in mind D. E. P. is relying on people like Mr.

5 Klepadlo to perform an essential government and public service.

6 THE COURT:  I get you, and I am going to give you a

7 chance to speak as to sentence in general.  I want to just

8 focus on B. 1 A. and the B. 4 and footnotes 5 and footnotes 8

9 as it relates to their objection only.

10 MR. HARRELL:  I was just getting to the risk factor,

11 Your Honor, that's applicable to the guided departure under

12 note five.  That is, there are approximately 10,000 permitted

13 facilities in -- P. D. S. facilities in Pennsylvania.  D. E. P.

14 has approximately 33 inspectors.  It is the operator, whether

15 they be an employee of the permittee or a contractor of the

16 permittee that formed the backbone of the regulatory process

17 under this program and formed the backbone of honest reporting

18 so that D. E. P. can look at data and decide where to spend its

19 limited resources, and failure to provide accurate data to the

20 D. E. P. misled D. E. P. about the nature of the circumstances

21 here but also misled the municipalities, the rural

22 municipalities who are employing Mr. Klepadlo for his

23 expertise, his knowledge, his training.  They relied on him.

24 They put their faith in him, and that presented a

25 risk to the public, presented a risk to the municipalities, and

1  they didn't get what they paid for in terms of risk.  Then

2  again you're talking about human waste here.  We are not

3  talking about some innocuous substance, and don't think anyone

4  needs an education into the potential harms that can be present

5  when human sewage is not treated properly.  Thank you, Your

6  Honor.

7          THE COURT:  Anything else you want to add?

8          MS. LOWRY:  Yes, Your Honor.  I apologize I didn't

9  introduce myself.  Meredith Harrell on behalf of the

10 defendants.

11         THE COURT:  You have entered your appearance.

12         MS. LOWRY:  With Mr. Bergere will step in and --

13         THE COURT:  I'm sorry, who?

14         MR. BERGERE:  Bergere.  I am co-counsel with

15 Armstrong Teasdale in Philadelphia.  And thank you for having

16 us today.  Just on a couple of the those points, I think the

17 government is conflating some of the facts, which are important

18 because --

19         THE COURT:  I only want to talk about the note five

20 and note eight in the objections at this point, not the general

21 discussion of sentence or your positions on sentence or

22 additional facts, relevant conduct, not relevant conduct or

23 things of that nature at this time, okay.  Anything else

24 related to the issue of the objections?

25         MS. LOWRY:  Yes, Your Honor.  So I think the point

1  word we have been trying to make here is that we are not

2  contesting there was a risk.  We are not contesting there was a

3  serious concern about what was going on.  What we're saying is

4  there was no real actual tangible harm that was done to the

5  environment to the river.  This isn't a type of case -- and I

6  don't think the government contests this -- there weren't dead

7  fish or dead birds.  That's all we're saying here.

8           THE COURT:  There were bloodworms, tampons, condoms,

9  other things in there that one would not consider to be part of

10 good fresh water.  Do you agree with that?

11          MS. LOWRY:  I will defer to my co-counsel.

12          MR. BERGERE:  Those were not found in the creek.

13 They were in the riprap channel, which is part of the facility.

14          THE COURT:  That leads to the creek.

15          MR. BERGERE:  It does, but again, as a regulatory

16 matter, this stream is not impaired.  There's a 303 D. list the

17 Court can judicial notice of the fact that the stream despite

18 all of the bad conduct that is being alleged by the government,

19 as a regulatory matter the stream is not impaired, it's not

20 been moved to the impaired status.  It's not on 303 D. list

21 under the Clean Water Act.  It's not in the 305 B. report under

22 the Clean Water Act which the Commonwealth prepares each year

23 and updates each other.  And at no time either any time from

24 2003 forward up to day has any action been taken by the

25 government to change the stream categorization as a result --

1    THE COURT:  You said 2003.  Did you mean 2013?

2    MR. BERGERE:  2013.  It's actually been 2003, too,

3  but that's not the relevant time frame, Your Honor.

4    THE COURT:  Having listened carefully to your

5  arguments, I am overruling your objections.  I believe Judge

6  Caputo did make the appropriate determinations in his

7  memorandum and order that he filed prior to this related to

8  your arguments as to 2 Q. 2.1 B. 1.  As to the requests under 2

9  Q. 1.2 B. 1 A. and B. 4, more particularly the application of

10  either footnote 5 to B. 1 A. or footnote 8 to B. 4, the Court

11  has the authority in those circumstances to either depart up by

12  two or depart down by two as a maximum, so it can go either

13  way.  I don't find any departure is appropriate under the

14  circumstances.  I think that the guideline was calculated

15  properly.  It appears to me that under footnote 5 that even

16  just the duration of the conduct is concerning in this

17  particular case, and I am not only talking about the actual

18  charged duration, but the statements by Mr. Klepadlo that this

19  was the process that was used over a course of 20 years.  And

20  so that is very concerning to me.

21    In addition as to the footnote 8, I think that the

22  nature and quantity of the substance involved and the risk

23  related to the offense was substantial and frankly more

24  devastating than is actually listed or tested.  In reviewing

25  Mr. Long, your expert's report, I find that even in his

1  calculations he didn't appear to use much of the data from Mr.

2  Klepadlo, and it concerns me.  I think the guidelines have been

3  properly calculated in this particular case, and I am going to

4  overrule the objections to the guidelines themselves.

5          What we're going to do next is we're going to cover a

6  couple areas.  First, I am going to ask counsel if there are

7  any requests for a formal departure under an enumerated section

8  of the guidelines.  We'll talk about -- if there are any of

9  those.  Then after we finish with that, I'm going to ask

10 counsel to incorporate whatever arguments they wish to make for

11 a variance from the guidelines with whatever other general

12 information or presentations they wish to make in terms of

13 sentencing.  When we get to that stage, the process will be

14 I'll first be asking counsel for their arguments related to

15 variance and/or any additional information.

16          Then I will ask Mr. Klepadlo if there's anything he

17 wishes to say before I impose sentence, and then finally I will

18 ask the government if there's anything they wish to say before

19 I impose sentence.  So we're going to begin first with any

20 requests for a departure under an enumerated section of the

21 guidelines, and we will start with the defense counsel.

22          MS. LOWRY:  No, Your Honor, we don't have any

23 departure arguments.

24          THE COURT:  All right.  With respect to the

25 government?

1       MS. OLSHEFSKI: No, Your Honor.

2       THE COURT: All right. So then we will move on, as I

3 said, the second aspect, which is a more encompassing aspect of

4 sentence where I'm going to -- and I have read very carefully

5 on multiple occasions not only the two presentence reports

6 since one was technically done for the corporate entity. I've

7 also read through all of your filings. I have read through all

8 of Judge Caputo's orders and memorandums on the case over the

9 period of time.

10      I have read through the government's sentencing

11 memorandums as well, and so I am familiar with those. But that

12 being said, I am not in any way limiting you to be able to say

13 what it is you think you would want to say during a sentencing

14 procedure since it's clearly an important aspect of the case.

15 So we will begin as I mentioned first with defense counsel.

16      MS. LOWRY: Your Honor, I do want to mention we have

17 two character witnesses. I don't know --

18      THE COURT: You have what?

19      MS. LOWRY: Character witnesses we would like to

20 present. I don't know the order of things you would like us to

21 --

22      THE COURT: However you would like to do that during

23 the course of whatever presentation you're going to make. With

24 respect to the character witnesses, my usual practice is just

25 have them come to the podium -- which we don't have -- I would

1  ask if one the C.S.O.s would come and turn the podium.  We had

2  it for a three-week jury trial we just finished facing the

3  jury.  Just have it turned to the back so people can use it.

4  My practice generally as you call a character witness, they can

5  come up to the podium, and then we will ask them to put their

6  full name and spell their last name on the record and whatever

7  it is they wish to say.  All right.

8        MS. LOWRY:  I would be happy to present them now

9  unless you want to --

10        THE COURT:  However you want to do it.

11        MS. LOWRY:  Okay.  I think we will call Linda

12  Klepadlo, the defendant's wife.

13        THE COURT:  Mrs. Klepadlo, if you'd come forward,

14  please.  If you'd state your full name and spell your last name

15  for us, please.

16        MS. KLEPADLO:  Linda --

17        MR. BERGERE:  May we have her daughter stand with

18  her?

19        MS. KLEPADLO:  K-le-p-a-d-l-o.

20        THE COURT:  All right, Ms. Klepadlo.

21  BY MS. LOWRY:

22  Q.    You can look at me over here.  Linda, can you tell the

23  Court how long have you been married to Dave?

24  A.    Forty-three years.

25  Q.    Okay.  And you're a retired nurse, correct?

1  A.    Yes, retired this year.

2  Q.    Okay.  And you understand that you're here for Dave's

3  sentencing hearing?

4  A.    Yes.

5  Q.    And do you remember writing a letter to the Court,

6  character letter?

7  A.    I do.

8        THE COURT:  I read it.

9  BY MS. LOWRY:

10 Q.    Is Dave embarrassed about what he's done?

11 A.    Absolutely.

12 Q.    Has this -- would you say it's consumed him for the last

13 four years?

14 A.    Yes, yes, both of our relationships.

15 Q.    Yeah.  And how have his convictions impacted his

16 reputation and your reputation in the community?

17 A.    It's ruined.  I mean, he lost all of his jobs.  I mean,

18 you know, everybody got rid of him as far as treatment plants

19 and that, and it's just -- it took away everything.  It

20 affected our whole life.

21 Q.    On a personal level, how has it impacted him, his health,

22 mental health?

23 A.    His health has definitely been affected.  He has had such

24 stress and this cardiac problem that he's had and everything,

25 it just -- I am sure it compounded it.  I'm a nurse, and I know

1  what stress does.  And it's really -- I mean, it has done a lot

2  to me, and it just -- it hasn't been good.

3  Q.    And, you know, you kind of mentioned obviously he lost his

4  business.  How has this impacted your family financially?

5  A.    Definitely.  I mean, he has no income coming in now.  You

6  know, I was a nurse until March of this year.  I left, and so I

7  don't have income coming in anymore either.  And because of

8  this health problems, I don't even want to go back per diem as

9  a nurse because I don't want to expose him to any COVID or

10  anything.  I mean, it's getting worse and worse, the situation,

11  and it's not healthy for him.

12  Q.    So Dave is a recovering addict, right?

13  A.    Yes.

14  Q.    Alcoholic?

15  A.    Yes.

16  Q.    And he has a sponsor, right?

17  A.    He does.

18  Q.    How often does he speak to his sponsor?

19  A.    I would say at least five, six times a week.

20  Q.    Okay.  How many times a week does he go to A. A. meetings?

21  A.    Lately almost every day, every morning.  He's on the Zoom

22  call.

23  Q.    Do you think lately because of this matter and --

24  A.    It has gotten worse.  The stress keeps getting worse and

25  worse and worse.

1  Q.   Now, Dave provides significant support to your daughter

2  who is at home with you, Lorissa.  This is your daughter

3  Christine?

4  A.   Yes, she's from California.  It's my daughter at home who

5  is disabled.

6  Q.   And Dave is part of her everyday well being, right?

7  A.   Yes, he does -- we share the burdens.  We cook.  We do her

8  laundry.  We do trips for her, numerous drugs -- to the drug

9  store -- and I mean it's constant -- and take her to

10 appointments, and they're not all in the area.  For instance,

11 we got to take her to Philadelphia for her skin condition that

12 nobody seems to be able to handle.

13 Q.   Before Dave was charged in this matter, would you say he

14 was proud of his accomplishments as an engineer?

15 A.   Yes, he was a pillar in the community.

16 Q.   Do you think -- since his convictions, what has that done

17 to his sense of self-worth and his accomplishments?

18 A.   It has ruined it.  I mean, he was always -- people used to

19 ask him to do the jobs.  He didn't even want to take on all of

20 the work that they wanted him to do.  But because he was -- he

21 was always professional and he always remembered and tried to

22 do the best for anything -- anybody in our community.

23 Q.   So I'm going to ask you two simple questions.  Is Dave

24 perfect?

25 A.   As an engineer?

1  Q.    As a person?

2  A.    Yes --

3  Q.    No, is he a perfect person?

4  A.    Perfect person?  Is that what you said?

5  Q.    Does he make mistakes?

6  A.    Oh, he's not perfect.  Nobody is perfect.  I mean,

7  everybody makes some mistakes.  But I mean, he was always very

8  professional and really was careful in anything he did.

9  Q.    Dave is a good man?

10  A.    Definitely.

11            MS. LOWRY:  No further questions.

12            THE COURT:  Anything you want to ask, the government?

13            MS. OLSHEFSKI:  No, Your Honor.

14            THE COURT:  Thank you, Ms. Klepadlo.

15            MS. KLEPADLO:  Thanks.

16            MS. LOWRY:  Your Honor, I would also like to call

17  Tony Quinn, who is in the audience.

18            THE COURT:  State your full name and spell your last

19  name for the record.

20            MR. QUINN:  Anthony Quinn.  Can I remove this?

21            THE COURT:  Yes.

22  BY MS. LOWRY:

23  Q.    Hi, Tony.  You know we're here for Dave's sentencing

24  hearing?

25  A.    Yes.

1  Q.    You've known Dave for many years, correct?

2  A.    I do.

3  Q.    Do you know how many years?

4  A.    I've known him many years.  I have known him very well in

5  the past ten years since he's in recovery.

6  Q.    You're his sponsor?

7  A.    I am.

8  Q.    What's your occupation?

9  A.    I was an orthodontist until last March.  I retired now.

10 Q.    Do you remember writing a letter to the Court on behalf of

11 Dave?

12 A.    I do.

13 Q.    How many years sober are you?

14 A.    Thirty-four.

15 Q.    Can you describe to the Court Dave's commitment to his

16 sobriety in the last ten years?

17 A.    Normally I work with more health professionals I do

18 outside, but in Dave's case I have known him, and he has been

19 exemplary in the recovery.  He took it from day one, and he

20 does work hard on it.  He talk to him five or six days a week.

21 He's at meetings at least five or six times a week but

22 presently because of COVID every morning on Zoom.

23 Q.    He's helped others with addiction, correct?

24 A.    He has.

25 Q.    Now, you speak to Dave every day, right?

1  A.    I do.

2  Q.    As a sponsor you know him on a deep level, correct?

3  You're not talking about the weather.  You're talking about

4  deeper issues when you talk to him?

5  A.    Yes.

6  Q.    Okay.  So you know him pretty well?

7  A.    I do.

8  Q.    Probably better than a lot people -- in fact, maybe most

9  people in his life?

10 A.    Yes, I would think.

11 Q.    I want to talk about you would -- you know how his

12 convictions and his conduct here -- how it's impacted him.  So

13 I just want to ask some questions about that.  Do you know how

14 this matter has impacted his reputation?

15 A.    I think it's devastated him.  I think that he did have a

16 reputation before this happened because he did represent a

17 number of agencies, but he lost everything after this occurred.

18 Q.    Do you know how it's impacted his family?

19 A.    That has been more devastating I think because his wife

20 really has been under a tremendous amount of stress.  She has a

21 daughter who has some physical problems that never been fully

22 diagnosed and have been all over trying to find it.  She is now

23 living at home, and it's been a problem for him, but he's been

24 dedicated to it.  On top of it, he cared for his mother, who

25 passed away a year ago.  He was responsible for her and visited

1  every day.  It was a dutiful son and faithful husband to his

2  children and to his wife.

3  Q.    You know his lost his business?

4  A.    Yes.

5  Q.    Are you able to tell the Court how -- if you do know how

6  this impacted him financially?

7  A.    Well, I think his wife pointed out that they have lost

8  everything.  What I was most concerned about with Dave is that

9  people in recovery -- most alcoholics tend to live in fear

10 based thinking and also in poor projection.  Alcoholics do not

11 project out positively.  So this whole experience has been a

12 very negative -- and I really probably try to hold his hand a

13 lot about worrying about the outcome of everything.  I tell him

14 if he does the next right thing, things will work out some way.

15 But he has been very dutiful in calling me and -- except on the

16 one occasion that caused this whole problem.  Other than that

17 he has been very faithful to me as a sponsor, which did not

18 happen very often with alcoholics and addicts.

19 Q.    Would you say that he is remorseful?

20 A.    Yes, I think he went through all the stages that we all do

21 coming from these things.  I think overall he has been

22 remorseful for what happened, what he caused, the difficulties

23 for his family, for this Court, for his community, for his

24 business.  It's been a devastation for him, and I do feel that

25 he is penitent.  You know, he's made -- he tried to make amends

1  where he could, but it has been difficult for everybody.

2  Q.    During the pandemic A. A. has had meetings on Zoom, right?

3  A.    Correct.

4  Q.    He's gone how many days a week?

5  A.    Every day.

6  Q.    Can you explain the importance for alcoholics -- but

7  particularly Dave, can you explain the importance of regular

8  meetings and open communication with you?

9  A.    Well, yes.  As I said to you, alcoholics including myself

10  tend to have more fear based thinking than they do normal

11  thinking.  So when in situations like he was in, they tend to

12  react instead of respond, and then the mistakes are made.  It's

13  after the fact.  So it is important for alcoholics to talk to

14  others.  We -- I cannot see myself.  I simply can't.  I can see

15  the other alcoholic.  I can see them clearly, but I can't see

16  myself.  So the reason that A. A. works is because alcoholics

17  together are able to see their own behavior patterns when in

18  fact their own way they can't, which is why one of the steps is

19  for when you're wrong to promptly admit it, and unfortunately

20  we are wrong, and it's necessary for us to make amends whenever

21  it happens.

22       And I think -- in these A. A. meetings he does not talk

23  about very specifically what happened here because it's not

24  appropriate for that to be talked about.  What we talk about in

25  A. A. is, what are you thinking, how are you feeling and how we

1  are reacting to those around you, whether it's family or

2  business or whatever.  He has kept it general.  When he talks

3  to me, I understand more of the problems he's created.

4  Q.   If he didn't have access to the group meetings and access

5  to you as his sponsor, how would that impact his recovery?

6  A.   Alcoholics are escapists.  There was a judge in New York

7  who I used to listen to on tape who said that when he was born

8  and he came out of the birth canal it was just too loud.  And

9  so the -- most of his life he drank to quiet it, and I think

10 that's the way we are.  Life is too loud, and so my biggest

11 concern for Dave would be -- which happens to many alcoholics

12 who relapse over time because of the stress of this.  It's

13 important for me to talk to him on a daily basis.  As I said,

14 we are escapists.  And when life gets too hard, it's back to

15 the alcohol or drinking.  That was -- Dave's drug of choice was

16 alcohol.

17 Q.   I have a couple more questions.  You said something about

18 making amends.  Especially with this matter, has he confided in

19 you about making amends?

20 A.   Yes, you know, as I said before, it's hard for us to see

21 ourself.  Our first thing to do is become defensive.

22 Alcoholics are good at becoming defensive and becoming victims.

23 It takes them talking to somebody else to recognize that's not

24 the truth of their life.  That's not what is happening.  And to

25 recognize they have to make amends even if it's ten percent of

1  the problem, they have to make the amends.  In Dave's case what

2  really concerned me more was the amount of stress, and his

3  cardiac situation really has concerned me all along.  And I

4  understood recently he was advised to have surgeries on his

5  legs to prevent clotting, which would exacerbate his cardiac

6  problem.

7        So his health has been compromised quite a bit with this

8  thing.  That was my big concern over the last four years that

9  he would react inappropriately, which he did in this one

10  circumstance, but he would react inappropriately because of the

11  stress he was feeling.

12  Q.  Would you say Dave wants to be a productive member of

13  society again and get past this?

14  A.  Well, yeah, you know, this been a very difficult -- I am

15  sure the Court recognizes that for anybody in these situations.

16  I think he wants to get back to his life for his children and

17  wife and grandchildren.  I think he's been willing to face up

18  with what happened to be sorry for it and hopefully move on in

19  his life.

20        MS. LOWRY:  No further questions, Your Honor.

21        THE COURT:  Any questions from the government?

22        MS. OLSHEFSKI:  None, Your Honor.

23        THE COURT:  Thank you, Dr. Quinn, and thank you for

24  your work with A. A.

25        MS. LOWRY:  Your Honor, I wanted to point out last --

well, the sentencing hearing in September of 2019 there were

quite a few people here for Dave, but because of the pandemic

they didn't come.  But there were about 15 people here, and

today Dave's daughter came from California, Christine.  She's

here, Linda, his sister and brother-in-law, Ann Marie and Matt.

They are in the audience here.  I am happy to give argument if

Your Honor --

THE COURT:  Okay.  Please.  You don't have to stand

-- you can -- whatever makes you comfortable.  If you like to

stand, stand, but you don't have to stand.

MS. LOWRY:  So I don't want to completely repeat our

sentencing memorandum.  But, Your Honor, I think there's kind

of two key things going on here.  The first issue is that when

you look at defendants who are convicted of this exact same

offense, not the witness tampering, but the Clean Water Act

offense, every one of them gets probation unless they also have

another conviction, another Clean Water Act conviction, or if

there are multiple false statement convictions.

You know, the Clean Water Act offense here, the false

statement act, that's the offense that's driving the guideline

range to be so high, not the witness tampering.  I included 23

cases in my original and Dave's original sentencing memoranda

kind of giving you a picture.  I also found two others last

night.  I kind of stumbled into them, two defendants, one was

sentenced in August 2019, the other was September 2019.  One

1  was a sewage water treatment plant owner.  The other one was

2  manager of a wastewater treatment facility.  The facts are

3  nearly the same.  They falsified data and D. M. R.s.  You know,

4  in one case it was -- the defendant admitted that untreated

5  sewage went into the environment.  That person got five years

6  of probation.  The other person got 36 months' probation.  I am

7  happy to provide citations to the Court as well.

8         It's -- the first person is Timothy Pierre, the

9  Northern District of West Virginia, 3:18-CR-66, and the second

10 case is Monica Borowicz, Eastern District of Virginia,

11 2:19-CR-00067.  I wanted to point out that the government's

12 supplemental memoranda they tried to distinguish Klepadlo from

13 a few different cases in the E.D.P.A.  I wanted to point out

14 that, you know, a lot of -- the distinct factor that the

15 government identified was Dave's obstruction offense.

16        But when you look at these cases, when you look at

17 the cases that the government is comparing or distinguishing

18 from Dave, their guideline ranges are based on the Clean Water

19 Act guideline, just like how Dave's guideline range is based on

20 the Clean Water Act.  In fact, one in particular, Crafton in

21 the Eastern District of Pennsylvania received -- I think it was

22 probation and home confinement mixed together -- very similar

23 facts as here, and the guideline range was actually -- the

24 Court applied the six-point enhancement and the four-point

25 enhancement.  So Crafton was in zone D., just like Dave, and

1  Crafton got probation.  A lot of this information isn't public,

2  but from reading the facts of these cases, I can only assume a

3  lot of these defendants were also in zone D. and they all got

4  probation.  Another key fact here is -- some of these other

5  defendants, Stomphill and Wellery, they concealed actual

6  exceedances into the environment.  So those defendants knew

7  that pollutants that exceeded the permitted limits were going

8  into the environment, and they concealed that.  That is not

9  what we have here.

10        We have something -- I am not downplaying Dave

11  Klepadlo's conviction -- but what his conviction and the

12  substantive offense that Caputo identified is different from

13  knowingly releases pollutants that exceed the permitted limits

14  into the environment, and those defendants were sentenced to

15  probation.  And I -- I just wanted to point that out to the

16  Court.  The other thing, and I -- this is also in the original

17  sentencing memorandum -- defendants who are convicted of some

18  of the worst substantive offenses including knowingly dumping

19  raw sewage into the environment, they don't -- they get less

20  than 37 months' imprisonment.  And the government is asking for

21  37 months' imprisonment for Dave Klepadlo when he didn't --

22  he's not convicted of a substantive offense.

23        You know, while the substantive guideline

24  enhancements are -- apply, I do think the Court should take

25  into account that he pled guilty to a false statement charge.

1  It was a D. M. R. that was dated January 14th, 2014, and that

2  has to mean something. So that's kind of the first part of the

3  variance argument here. The second variance argument is Dave's

4  health and the fact that we're in the middle of a pandemic, and

5  I looked at the B. O. P. statistics last night. And all of the

6  -- I don't know if you remember in my supplemental memorandum

7  --

8          THE COURT: I read all of your statistics in there

9  concerning the different institutions, and I actually get

10 reports on that daily.

11         MS. LOWRY: Yeah, I am sure you probably still get

12 compassionate release petitions. And all of those facilities

13 that are listed in the supplemental sentencing memorandum

14 currently have active COVID cases except for one --

15         THE COURT: Except the numbers are significantly down

16 from what you had in your original sentencing memorandum, but

17 go ahead.

18         MS. LOWRY: You mean the active cases?

19         THE COURT: Yes, even completed cases -- well,

20 completed cases are completed, but active cases where people

21 have recovered.

22         MS. LOWRY: I think, Your Honor -- I notice sometimes

23 some of the numbers even with the recovered statistics change

24 -- change a lot. I think the issue -- I think the B. O. P. is

25 working hard to figure out it -- but I think there's been a

1  serious lack of testing going on, and just recently there's

2  been more testing of asymptomatic inmates.  And I think the

3  point that I'm making here is that Dave isn't a defendant

4  coming before you saying his hypertension will give him maybe,

5  you know, make him more sick than someone else who doesn't have

6  hypertension.

7            He has serious heart conditions that just recently

8  our medical community is realizing they might be worse than

9  lung diseases.  Heart conditions and COVID have a deadly

10  combination.  His chances of contracting COVID in prison right

11  now are very high, and he's the type of person who will end up

12  on a ventilator no doubt about it, and that's what -- and when

13  you take that and you compare it to everything else, the

14  comparative sentencing analysis, you know, the fact that he has

15  been supervised for the last four years, he -- he's 65.  He

16  surrendered his license.  He's not going to reoffend because he

17  couldn't reoffend because he doesn't have his license.  He

18  suffered greatly financially.  His reputation, he lost his

19  business.  He lost his, you know, everything.

20            You know, his family is worried about him.  This has

21  impacted them and their reputation in their small community.

22  Now, in terms of general deterrence, you know, I understand,

23  like, the need for that, but here's the thing.  You have to

24  weigh that against COVID, the pandemic, his health issues, the

25  comparative sentencing analysis, what benefit would come from

1  sending David Klepadlo to prison in comparison to the cost of

2  it or the serious risk of it, and that's -- I would submit to

3  you, Your Honor, that I think the cost of it outweighs any

4  benefit of fulfilling the goals of sentencing.  I think the

5  least restrictive sentence here is a lengthy period of home

6  confinement.  Now, the other thing I want to mention -- and you

7  may want to address this later -- I don't know if the

8  government is still requesting restitution.  But I would like

9  to respond to that if that comes up.

10  And I would also like to point out that his -- David

11  Klepadlo's company is not operating.  There's no money.  So

12  there's -- there's no real ability to pay a fine at least from

13  the company's perspective.  And I also wanted to let the Court

14  know that Dave Klepadlo has a follow-up appointment at Penn on

15  November 23rd, which I sent to probation.  There's a chance

16  that he's going to need another ablation at some point -- not

17  in the near future.  We don't -- we don't know.  And his

18  primary care doctor also identified some other serious issues,

19  and he's been referred to a vascular surgeon and he will be

20  seeing the surgeon on November 3rd.  I would like to you

21  consider those two things.  Do you have anything?

22  MR. BERGERE:  Your Honor, if I may, Tim Bergere

23  again.  I wanted to address again to put it into context

24  because the government's memos conflate quite a bit of the

25  conduct and also get into this issue of what is relevant

1   conduct.  Quite a bit -- nearly all of the documentation the

2   government has submitted relate to periods of time that are

3   well past January of 2014 and the time for which he was

4   acknowledging guilt for P. H. and in his own mind what he was

5   dealing with was P. H., and the government has included memos

6   from some guy named Ed Gillette, who came in to take over the

7   plant many years later.  At that time it was actually under the

8   operation of another operator, the Bruce Evans Jr., at that

9   time.  And there's just as many sample results that show

10  compliance.

11          One of the reasons Mr. Long, for instance, did not

12  rely on any of the D. M. R. reports sampling was because most

13  -- every single one of them demonstrated compliance.  Some did

14  not.  There was actually -- during the D. M. R. some reported

15  there were exceedances from time to time.  It's the nature of

16  the sewage treatment plant operation that there will

17  occasionally be exceedances.  What Mr. Klepadlo failed to do

18  was to require Mr. Sheposh's employee, who was the operator

19  with the plaque hanging on the wall -- -

20          THE COURT:  I have to tell you in all honesty you can

21  continue, but I think you're hurting yourself.

22          MR. BERGERE:  Okay.

23          THE COURT:  I don't think -- I don't think that

24  blaming it on Mr. Sheposh --

25          MR. BERGERE:  No, I don't blame Mr. Sheposh.  We

1  fully accept responsibility.

2        THE COURT:  -- or mitigating relevant conduct over a

3  long period of time is in any way beneficial.  Strategically if

4  you wanted to say that, I would have started with you and ended

5  with counsel's arguments.  You can continue on if you want.

6        MR. BERGERE:  No need to.

7        THE COURT:  I don't think you're helping yourself.

8        MR. BERGERE:  My main point was just to deal with the

9  government's evidence being several years later.  Thank you.

10        THE COURT:  Anything else from counsel?

11        MS. LOWRY:  No, Your Honor.  May I have a chance to

12  respond if something new comes up?

13        THE COURT:  Yeah, usually we want you to tell us

14  whatever you're going to tell us now --

15        MS. LOWRY:  I have exhausted my arguments.

16        THE COURT:  Mr. Klepadlo, anything you wish to say

17  before I impose sentence?  You can slide your mask down if you

18  wish.

19        THE DEFENDANT:  Yes, sir.  Your Honor, I'm sorry for

20  what transpired here.  I submitted a letter that summarizes my

21  remorse for what happened here.  I apologize to the Court,

22  community and my family.  I am genuinely sorry for what

23  occurred here.  That's all I have, Your Honor.

24        THE COURT:  All right.  I just so the record is

25  clear, I have read everything involved in this case, every

1  letter, every document, everything.  It's my practice.  That's

2  what I did.  And I always -- I am interested when people

3  apologize to the Court, and it's, like, you don't have to

4  apologize to me.  Your apology to your family makes sense

5  because you have hurt your family in doing this in the long run

6  and to the community because clean water is something we have

7  to do.  So those apologies I think make sense.  All right.

8  Counsel for the government?

9          MR. HARRELL:  Thank you, Your Honor.  With regards to

10 restitution, as the presentence report makes clear, the

11 government is not seeking restitution.

12         THE COURT:  There are civil cases --

13         MR. HARRELL:  There's a civil case.  We will let that

14 play out.  That's not an issue.  With regard to the variance

15 and the sentence the government is seeking in this case, we

16 shouldn't be here today.  Nobody should be here today.  Mr.

17 Klepadlo is a licensed professional engineer.  He was a

18 licensed waste water treatment plant operator.  He ran a

19 successful business.  We're here today because he didn't follow

20 the law, and it's a sad day.  I wish we weren't here, but we

21 are.

22         And with regards -- let me address the variance

23 aspects of the argument, and I will talk about the government's

24 sentencing recommendation.  With regards to harm, we have been

25 through that.  It's the same factors that were discussed in the

1 guided departures, so I will not focus that much on it. But

2 the analysis is the same. The parties just have a fundamental

3 disagreement whether it's about relevant conduct that should be

4 considered, whether it's about the risk that was presented in

5 this case, the actual harm. The parties have outlined those in

6 their sentencing memos. This was conduct that went on for 20

7 years by the defendant's own admission to agents. D. E. P.

8 told him repeatedly sample every day, only put real sample data

9 on your D. M. R.s. He ignored them. He knew better. He

10 didn't see the need. He's being paid by rural municipalities

11 to perform a job.

12          It's just not coming out in sampling every day.

13 Plants need operation and maintenance. They need regular care.

14 They are not just on auto pilot. It wasn't just a matter of

15 Mr. Klepadlo or Mr. Sheposh coming to take a sample. It's

16 looking at what's going on at the plant. The photos we have

17 shown over a period of four or five years and the other

18 evidence show that. You have to come out. You are getting

19 paid to come out every day. You are getting paid by rate

20 payers and municipalities who are relying on his expertise and

21 his expertise alone.

22          The other thing I want to mention with regards to the

23 variance in particular was again going back to the nature of

24 the self-reporting system that's at the heart of the Clean

25 Water Act. On the front of every D. M. R. there's a block that

1   says you are subject to criminal penalties if you provide false

2   information, and he signed those month after month, year after

3   year knowing he wasn't doing what the permit required.  And

4   that's on him.  That's why we're here today and his failure to

5   operate and maintain.  D. E. P. inspectors should not have to

6   come in E. P. A.'s criminal investigation program to bring

7   facilities into compliance.  That's just -- shouldn't happen

8   with someone of his expertise.  And that's sort of at the core

9   of why we're here and the government's arguments about why Mr.

10  Klepadlo needs to go to prison.  And I wish I wasn't here

11  saying that.

12          But if not him, who is going to go to jail?  The

13  cases the defendants cite mostly but not exclusively -- and I

14  am familiar with the facts on a number of them deal with low

15  level operators who cooperated with the government.  That is

16  not the fact pattern here.  There is no disparate sentencing

17  argument here.  What sort of is getting lost in the

18  environmental issue --

19          THE COURT:  When you say cooperated with the

20  government, do you mean after they were arrested, they were --

21  they admitted their guilt as opposed to challenged their guilt?

22  What exactly do you mean by cooperate?

23          MR. HARRELL:  When they were approached and notified

24  they were the subjects of investigations, they came in and

25  cooperated with the government, prepared to testify against

1  others --

2          THE COURT:  In all those cases?

3          MR. HARRELL:  Not all of them because I haven't

4  researched them.  I can tell you that as we point out in our

5  sentencing memo the ones that either or Ms. Miller, my

6  colleague at E. P. A. served as special assistant U.S.

7  attorneys, the low level operators came in.  They were not the

8  owners --

9          THE COURT:  I read that in your sentencing memo.

10 There was three of those that the two of you had some

11 involvement --

12         MR. HARRELL:  Three different cases, and so --

13         THE COURT:  There seems to me a significant number

14 more where the ultimate sentence was certainly significantly

15 less than 37 months.

16         MR. HARRELL:  Your Honor, I think that points out

17 another distance.  Counsel pointed out to -- again, this is a

18 D. M. R. case, it's not a case of illegal discharges into the

19 environment.  We just completely disagree with that.

20         THE COURT:  You don't have to argue that.  I have no

21 problem with the fact that the relevant conduct here relates to

22 the entire activity and not merely the idea of what we're able

23 to negotiate in terms of our plea for purposes of counts, you

24 know, four and -- counts one or counts four, whatever the two

25 counts are that -- that's not of significant concern to me.

1  It's clear relevant conduct incorporates the relevant conduct

2  of the activity involved and always has in the federal system

3  as approved by the Supreme Court.  So go ahead.

4        MR. HARRELL:  Again, Mr. Klepadlo owns his own

5  company.  He decided how many employees he hired.  If he didn't

6  have enough employees to do what he contracted with others to

7  do, again, that's on him.  It's clear from the taped

8  conversations that and the conversations with D. E. P.

9  inspectors he saw himself at a different level knowledge wise

10  and every other way.  Again, going back to the obstruction of

11  justice, after he -- after the investigation started, not once,

12  but at least twice he went to his employee and tried to get him

13  to lie to federal agents.  This is not just an environmental

14  case.

15        This is an obstruction of the federal criminal

16  justice system.  That is borne out as he described to himself

17  to the letter to the Court that he was arrogant.  He was

18  arrested, brought in for his initial appearance.  The

19  magistrate spent time going over with him he that he could not

20  --

21        THE COURT:  There are no magistrates in the federal

22  system.  You mean the magistrate judge?

23        MR. HARRELL:  Magistrate judge, Your Honor.  Sorry.

24        THE COURT:  1991 they changed that title for that

25  reason.  That was 30 years ago.

1    MR. HARRELL:  My apologies, Your Honor.  The

2 magistrate judge pointed out to him don't go contacting any

3 witnesses, and it was only a matter of hours he was right back

4 talking to his employee and had to be rearrested again.

5 Perhaps there is a -- that much of a need for specific

6 deterrence here.  But again, you look at the number of cases

7 involving waste water treatment plant operators who were

8 cheating on the reporting obligations.  Here we have the owner

9 of a company self-admittedly doing it for 20 years.  This is

10 not a one-and-done situation.  He was -- he misled his

11 employers, his clients by telling them everything was fine,

12 look at my sampling data.

13    As you point out, his own consultant could not use

14 his data to formulate the expert opinion that the defense

15 relies on.  And he seeks to take advantage today of the lack of

16 the data by saying, well, there's no evidence of harm.  Well,

17 there's no data because he didn't go out and get it.  He just

18 made it up.  The last thing I just want to say about this case

19 is his letter to the Court and his filings he spends a

20 considerable amount of time talking about his efforts to help

21 Mr. Sheposh.  And if you read the government's sentencing memo,

22 your first one --

23    THE COURT:  I did.

24    MR. HARRELL:  I am sure you have.  He's affirmatively

25 urging his witness to lie, to mislead agents.  And this is just

1  a pattern of his conduct for 20 years, I know better, no one

2  will tell me what I have to do. But more importantly for all

3  of the waste water treatment plant operators and the owners of

4  contract companies such as his, there needs to be a deterrent

5  message here, and home confinement simply is not enough. Thank

6  you.

7          THE COURT: Let me ask you what your position is on

8  the likelihood of Mr. Klepadlo recidivating.

9          MR. HARRELL: I would say it's small. Defense

10  counsel mentioned that he had surrendered his license. The

11  reality is he has to get that license renewed, and D. E. P.

12  once he pled guilty, the chances that he would have gotten his

13  license renewed --

14          THE COURT: I get the licensing factor. In terms of

15  --

16          MR. HARRELL: Him personally, I would say the odds

17  are small because he's not going to be in that business

18  anymore. Thank you, Your Honor.

19          THE COURT: Thank you. Anything else you want to add

20  related to that?

21          MR. BERGERE: I think as a point of reference I think

22  mistakenly said Mr. Klepadlo had signed all of the D. M. R.s.

23  He had not actually signed any of them, but --

24          MS. LOWRY: Yeah, Your Honor, just for the record,

25  this is not --

1    THE COURT:  You're referring to his employee that

2  signed it?

3    MS. LOWRY:  Yes.

4    THE COURT:  Who would be an agent, all right --

5    MS. LOWRY:  Of course.  Exactly.  He said that David

6  Klepadlo signed it.  I just want to clear this up.  The D. M.

7  R. underlies count four -- Dave's employee signed.  David

8  Klepadlo is taking responsibility, and he's not -- he's not

9  shifting blame to his employee.  He understands his name is on

10  the door.  The point of even bringing up his employee is to

11  provide the Court with context regarding the nature and

12  circumstances of the offense because that is what we do at

13  sentencing.  We're not intending to shift blame.  I just want

14  to clear that up.

15    THE COURT:  All right.  Lawyers always have a

16  tendency to argue the minutia on both sides.  And while I

17  appreciate that, and I probably would have done that as well,

18  for me the perspective is more overall looking at all the

19  circumstances and factors.  As I mentioned, I have read very

20  thoroughly the presentence report in the case, the addendum to

21  the presentence report, in addition to that, the letters that

22  were filed, the sentencing memorandum of counsel that were

23  filed and the exhibits that were attached to those memorandums.

24    I always take knowledge of the fact that I'm

25  presently sitting in the courtroom that Judge Conaboy sat in

1  for forever.  I don't formally sit in this courtroom, but they

2  are doing something to mine.  But I have a distinct

3  recollection of him saying virtually every time there was a

4  sentence that it's the hardest thing that we do as judges.  And

5  I remember sitting there for the most part as a prosecutor

6  thinking what is sort hard about it, just sentence the guy.

7  Now I realize how correct he was because at the end of the day,

8  of course, nobody is happy, and there's no way for me to read

9  the future to figure out what will or won't happen in any

10 regards.

11        So it is a very difficult process because I know it

12 involves a lot of human factors and people and their family.

13 You know, the -- this is a very -- I have read through this

14 stuff.  I can't tell you how many occasions I have read through

15 this stuff.  It's really such a disappointing case in so many

16 ways.  Your conduct, Mr. Klepadlo, is truly offensive whether

17 it was arrogance or laziness or whatever it may be, it truly

18 was offensive.  The fact you were getting paid -- I forget the

19 exact amount -- but around 50 grand a year from these

20 municipalities to just go and check .  You know, that -- when

21 they put the video up, I think in -- as I recollect in

22 Greenfield it was something like 116 days of which somebody

23 showed up on, like, 16 days or something like that and tests

24 were taken on seven of those days.  Jeepers.  And then the

25 numbers were slightly less I think in -- or somebody showed up

1  a little bit more in Benton, but the numbers were just

2  incredible.

3          And there was significant arrogance here when you

4  were questioned about it or told about it in that, you know,

5  this is what I've been doing for 20 years, this is what I

6  always do.  I know better than you.  You know, our clean water

7  and clean air are clearly under attack at the highest levels of

8  government right now, and we all need to breathe and drink the

9  stuff on this planet if we're going to have a planet.  You

10  know, you said before -- one of the questions you asked Mrs.

11  Klepadlo was Mr. Klepadlo perfect.  Of course her answer was,

12  no, he's not perfect, nobody is perfect.  I always think my

13  grandchildren are perfect, and I would like there to be a

14  planet for them at some point in time when they get old enough

15  to enjoy it.

16          And I am concerned about what we're doing to the

17  planet, and your activities were really not helpful.  I do

18  think it was in -- in your own words an arrogance.  I know

19  better than you, I can do what I want to do, I don't have to

20  listen their bureaucracy.  The heck with their bureaucracy.

21  That part is really concerning and the amount of water that

22  ultimately was discharged that went in there.  No, it's a very

23  conservative estimate over the -- the period of time -- if you

24  go longer, it's just significantly bigger that that roughly 8

25  million gallons over the periods involved in the indictment

1  alone were flowing in there, and testing was an insignificant

2  amount of that if there was any testing.  That's really

3  terrible on your part.  It's frankly terrible.

4        The other side of the coin is the government -- the

5  guidelines are what the guidelines are, and your obstruction is

6  really bothersome, too, although I have seen much worse

7  obstruction in federal court than what you did.  That being

8  said shortly after Judge Mehalchick had specifically advised

9  you, you are not to have any contact witness, victim, within

10  hours you called up that guy and tried to fix his arguments not

11  knowing that he had spoken with or was involved with the F.B.I.

12        That's concerning.  It does put this in a little

13  different twist than the cases that don't have that kind of

14  affirmative obstruction.  That being said, the guidelines, you

15  know, in this case are 37 to 46 months.  I find the government

16  -- I understand their recommendation within the guidelines.  I

17  find it to be again kind of like the bureaucratic cookie cutter

18  that's the guidelines so we will argue the bottom of the

19  guidelines.  I don't find it that it considers all of the human

20  factors involved in the case, not much of which is beneficial

21  to you in terms of your activities in the case.  But it's my

22  job to try to view all of the factors.

23        And I have considered those.  You know, the problem

24  with personal tragedies are that in every case I sentence --

25  every sentence I sentence, the family ends up being punished

1  even though no one wants to punish the family.  Every single

2  case.  The same thing happens in that regard that family

3  members who did nothing wrong effectively end up being punished

4  because of the family member that did something wrong.  And so

5  that's really concerning to me here.  I have looked at those

6  cases, not all of them, but I looked at some of the cases cited

7  from the 26 or so you cited related to -- the defense cited to

8  other sentences.

9           I do find a sentence of 37 months would be an

10  unwarranted disparity in this case.  I disagree with the

11  government's articulation that it wouldn't be a disparity.  I

12  think it would be a disparity in the case, and I think that for

13  the most part you received your additional two points for

14  obstruction.  So under the guideline calculation and -- you got

15  your two points, and so the bottom line is that is incorporated

16  into -- into, you know, how that's viewed.  But if you took

17  that two points away, you know, your sentence would now be

18  something like 30 to 37 months, which would be the sentencing

19  guideline in theory that most of those other individuals had

20  that received something other than an incarceration sentence.

21           And so I am not so sure that two-point difference

22  while it clearly has some significance is not of terrible

23  significance.  I also have to consider -- and I appreciate Dr.

24  Quinn's words as well as Mrs. Klepadlo's words in the case.

25  I'm also -- I have to -- I can't not consider in today's world

1  COVID-19, and I am considering that.  The problem again turns

2  out just like every sentence an individual makes an argument of

3  how this is going to negatively effect their family and be --

4  and their family will be punished, and that's true in every

5  case.  Similarly, in today's world every sentencing involves an

6  argument because of COVID-19 I shouldn't go to jail because,

7  you know, I may get infected.  You are a little bit of

8  different circumstance I have to admit.  I have looked

9  carefully at the medical information this was sent to me.

10           I note as a side note that there have been an article

11  some months ago or probably a month ago my wife brought to my

12  attention, who is also a medical professional, that I think it

13  was the Big Ten or one of the football conferences.  They had

14  done a study of students who are on the football team -- teams

15  who had tested positive but had no symptoms and because kids at

16  that age are generally invulnerable -- they get a little chill,

17  and that's end of it for many of them, not all of them, but for

18  many of them.  They noted upward of 60 percent of them after

19  testing positive with no apparent side effects or symptomology

20  had heart concerns after that, that they had found some

21  irregularities as to congestive heart failure around their

22  heart, which was very interesting.  She pointed that out just

23  -- I just say it not related to this case in any way but in

24  general.

25           I looked very carefully at your medical records.  You

1 had the heart attack, valve replacement.  It's described as an

2 open procedure.  Was it a TAVR, or was it -- it was an open

3 procedure -- and the ablation, which was partially successful.

4 And all of those factors are factors that I feel compelled to

5 take into consideration as well in deciding what is an

6 appropriate sentence in your particular case.

7          That's part of my job to make a determination of the

8 particular case.  On the facts of the case itself, one of the

9 things I need to consider under 3553 is the nature and

10 circumstances of the offense.  That doesn't play well for you.

11 It's a bad offense.  It does -- potentially affects other

12 people.  I agree with the government's perception of the fact

13 that since many of these plants are run by people who are

14 really under the honor system that it's impossible to hire

15 enough inspectors to be sitting at every plant.  They expect

16 the true professionals at those plants will be honest and show

17 integrity.  You failed to do that over a long period of time.

18 The nature and circumstances of the offense don't work well for

19 you at all.

20          The Court also has to consider the need to impose a

21 sentence to reflect the seriousness of the offense, promote

22 respect for the law and provide just punishment for you.  That

23 includes to protect the public from further crimes by you.  In

24 that regard it probably works in your favor because my -- I

25 said I can't read the future -- my expectation is that this

1  would be an experience that you would not want to go through

2  again and so the result was that I would find it very hard to

3  believe under your age and station in life that you would be

4  involved with any criminal activity.  So part of what the Court

5  needs to do is to impose a sentence to deter you, and I don't

6  know that I necessarily need to do that.  I think this process

7  has worked.  It's also to consider a sentence that helps deter

8  others from conduct like yours.

9         That's a little more problematic and concerning.

10 It's also -- the Court needs to impose a sentence under the

11 statute that deals with your educational, vocational and

12 medical needs.  The educational and vocational are not of

13 particular concern.  The medical need is of concern under your

14 present health circumstances and the COVID epidemic that's

15 ravaging the country and on a spike as we sit here now.  I also

16 have considered -- although maybe this is not something I am

17 technically supposed to consider.

18        I have also considered the your oldest daughter and

19 her condition as well and the fact that she is now dependant

20 upon you and your wife, who are both retired.  And I think that

21 -- I know that on more than one occasion probation has

22 indicated to me your requests which were granted to travel

23 outside of the district for purposes of medical appointments

24 related to your daughter as well.  So I've tried to consider

25 all of those factors in deciding what is an appropriate

1  sentence in your case.  And I -- I have listened very carefully

2  to the arguments of counsel in the case.  While I respect

3  everybody's positions, at the end of the day the responsibility

4  for deciding a sentence is really mine and mine alone, and I

5  take that responsibility seriously.

6          So with respect to you, Mr. Klepadlo individually,

7  pursuant to the Sentencing Reform Act of 1984, it is the

8  judgment of the Court that the defendant, David D. Klepadlo, is

9  hereby committed to the custody of the Bureau of Prisons for a

10  term of time served.  You will be on supervised release for a

11  period of three years, and during that period of supervised

12  release, you are going to be on home detention for a period of

13  one year.  During that period of time, there will be provisions

14  made for you to attend medical appointments, work if that

15  becomes something that you find employment, religious services,

16  necessary food and other outside activity.  But aside from

17  that, you will be confined to your home during that period of

18  time.  You may request from the probation office permission to

19  leave for other matters that I have considered here, and they

20  will make an appropriate judgment based upon that.

21          It's ordered you shall pay to the clerk of the U.S.

22  District Court a special assessment in the amount of $100.

23  That's due immediately.  You individually I'm making a finding

24  do not have the ability to pay a fine.  So a fine is waived.

25  The defendant shall be placed on supervised release, as I said,

1  for a period of three years.  While on supervised release, you

2  shall not commit another federal, state or local crime, and you

3  shall not possess a dangerous weapon.

4         The defendant shall comply with the standard

5  conditions that have been adopted by the Court and the

6  following special conditions.  You must cooperate in the

7  collection of a DNA sample as directed by the probation

8  officer.  You must not incur -- you must continue in your --

9  during the course of your supervised release period in your A.

10 A. activities, and if requested by the probation officer, you

11 must submit to random alcohol testing to make sure that you are

12 in compliance with that, and you must comply as they deem

13 appropriate with any additional treatment or treatment provider

14 activities related to that particular condition.

15        I'm going to find you pose a low risk of future other

16 substance abuse, and so, therefore, I am going to suspend the

17 mandatory drug testing that would be involved in your case.

18 Now, with you individually, one can normally appeal their

19 conviction if they believe their guilty plea was somehow

20 unlawful or involuntary or there was some other fundamental

21 defect in the proceedings that was not waived by the guilty

22 plea itself.

23        One also normally has a statutory right under certain

24 circumstances to appeal their sentence particularly if they

25 believe that the sentence is contrary to law.  However, a

1  defendant may waive or give up those rights as part of a plea

2  agreement.  In this particular case you have waived your right

3  to appeal your plea of guilty and your sentence in this

4  particular case.  Such waivers are generally enforceable.  If

5  you believe for some reason the waiver is unenforceable, you

6  may offer that argument to the Third Circuit.  With few

7  exceptions, a notice of appeal must be filed within 14 days of

8  the date that sentence is imposed.  Today is the 28th of

9  October.

10      So if you wish to file a notice of appeal, it would

11  have to be filed on or before November 12th of 2020.  If you

12  are unable to pay costs of appeal but wish to appeal, you may

13  apply to appeal in forma pauperis.  If you do that, the clerk

14  of court will prepare and file a notice of appeal on your

15  behalf.  Do you understand all of that, Mr. Klepadlo?

16      THE DEFENDANT:  Yes, sir.

17      THE COURT:  With respect to the corporation's

18  sentencing, again, pursuant to the Sentencing Reform Act of

19  1984, it is the judgment of the Court that the defendant David

20  D. Klepadlo Associates, Inc., is hereby placed on probation for

21  a period of five years.  The Court finds that the defendant

22  does have the ability to pay a fine, the corporate defendant,

23  and it's ordered that the defendant shall pay to the clerk of

24  the U.S. District Court a sum of $10,400 consisting of a

25  special assessment of $400 and a fine of $10,000.  The special

1  assessment is due immediately.  Payment of interest is waived

2  on the fine.

3          While on probation, the defendant organization shall

4  not commit another federal, state or local offense, and the

5  defendant shall comply with the standard conditions that have

6  been adopted by the Court and the following special conditions.

7  Again, this relates to the corporation.  The corporation must

8  not incur any new credit charges or open additional lines of

9  credit without the approval of the probation officer.  The

10 corporation must provide the probation office with access to

11 any requested financial information and authorize the release

12 of any financial information.

13          The probation office may share that information with

14 the United States Attorney's Office.  The corporation must

15 comply -- apply all moneys received from income tax refunds,

16 lottery winnings, judgments or any anticipated or unexpected

17 financial gains to the outstanding court-ordered obligations.

18 If the judgment imposes a financial penalty, which it does, you

19 must pay the financial penalty in accordance with the schedule

20 of payment sheets on this judgment.  You must also notify the

21 Court of any changes in the corporation's economic

22 circumstances that might affect the ability to pay that

23 financial penalty.

24          The law requires that -- as I recollect that

25 corporate matter fines need to be paid within five years of the

1  time that they are imposed, and they should be paid within the

2  five years of the probation, which would be 60 months, which

3  would make it something like $150 a month would have to be

4  minimum that was paid over the period of probation.  So it must

5  be paid in monthly installments of no less than $150.  I will

6  rephrase that and -- I don't know -- the calculation, the

7  $10,000 and divide it by 60 months and round up to the next --

8  I should have looked at this in advance, and I didn't -- $175 a

9  month over the period of -- no less than 175 a month over that

10 period of time.

11         Again, with respect to the corporation, one can

12 normally appeal their conviction if they believe their guilty

13 plea was somehow unlawful or involuntary or if there was some

14 other fundamental defect in the proceedings that was not waived

15 by the guilty plea itself.  One can also have -- one also has

16 normally a statutory right to appeal the sentence in certain

17 circumstances particularly if they believe the sentence is

18 contrary to law.

19         Again, a defendant can waive that right as part of

20 the plea agreement.  The corporation has, in fact, waived that

21 right as part of its plea in this particular case.  Those

22 waivers are normally enforceable.  If you believe that it is

23 unenforceable, you may present that theory to the appellate

24 court.  Normally a notice of appeal must be filed within 14

25 days of the date that sentence is imposed.  Again, today is

1   October 28th, 2020.  If you wish -- or the corporation wishes

2   to file a notice of appeal, it must do so on or before the 12th

3   day of November 2020.  If the corporation was unable to afford

4   the costs of an appeal but wish to appeal, it may apply to

5   appeal in forma pauperis.  If it did that, the clerk of court

6   would again prepare and file that notice of appeal.  With

7   respect to the remaining counts in the indictment, is there a

8   motion by the government?

9            MS. OLSHEFSKI:  Yes, Your Honor.  The government

10  moves to dismiss the remaining counts in the indictment against

11  the defendant and the corporation.

12           THE COURT:  All right.  I assume there's no

13  objection?

14           MR. BERGERE:  No objection.

15           THE COURT:  The motion is granted.  The remaining

16  counts against the defendant and the corporation are dismissed

17  on motion of the government.  Anything else we have from the

18  government?

19           MS. OLSHEFSKI:  No, Your Honor.

20           THE COURT:  The defense?

21           MS. LOWRY:  No, Your Honor.

22           MR. BERGERE:  No, Your Honor.

23           THE COURT:  Good luck to you, Mr. Klepadlo.

24

25

REPORTER'S CERTIFICATE

    I, Laura Boyanowski, RMR, CRR, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.




                        s/ Laura Boyanowski, RMR,CRR
                        Laura Boyanowski, RMR, CRR
                        Official Court Reporter

REPORTED BY:

    LAURA BOYANOWSKI, RMR, CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    235 N. Washington Avenue
    Scranton, PA  18503


    (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)